UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JAMEEL WILLIAMS,

                    Petitioner,                    **DECISION AND ORDER**
        -vs-                                       No. 02-CV-0755

VICTOR HERBERT, Superintendent,
Attica Correctional Facility,

                    Respondent.
_____

**I.      Introduction**

        Petitioner, Jameel Williams ("Williams"), filed this *pro se* petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Monroe County Court on one

count of second degree murder. The parties have consented to the disposition of this matter by

the undersigned pursuant to 28 U.S.C. § 636(c).

**II.     Factual Background and Procedural History**

        Williams was convicted after a jury trial of second degree (intentional) murder (N.Y.

Penal Law § 125.25(1)) in connection with the beating death of Daryl Bryant ("Bryant") on the

evening of January 6, 1995. The prosecution presented the testimony of two eyewitnesses,

Dorothy Walker ("Walker") and her niece, Racheal Johnson ("Johnson"). Walker testified that

she and Johnson were driving to the supermarket at about 7:45 p.m. when she saw "two people

wrastling [*sic*], fighting in the street" at the corner of Wakefield and Holden in the City of

Buffalo. T.84.[1] Walker stated that one of those individuals was in the courtroom that day, and

_____

[1]          Citations to "T.__" refer to the trial transcript.

she identified Williams. T.85. Walker testified that she gave a description to the police at the time of the incident, describing the person as a black male between 5'8" and 5'10", and 145 to 160 pounds, wearing a red jacket, white shirt, black pants and black "sneaker boots." T.85-86. Walker was permitted to testify that on June 30, 1995, when she accompanied her niece to the *Wade*[2] hearing, she saw Williams in the hallway of the courthouse and identified him as Bryant's assailant. T.87-88. On cross-examination, Walker admitted that there were police officers escorting him at the time and that that was the first occasion she had ever identified Williams as being involved in the incident. T.136-37.

According to Walker, when she first saw Williams and Bryant in the street, they were in a "wrestling position," with Williams on top. T.91. Walker said that the "deceased pulled the defendant's scrotum," and Williams said, "Let go of my nuts." T.91. At that point, "they really hit the ground." *Id.* Williams was "punching [Bryant] in the face and then he had his neck a couple times choking him." T.91-92. Williams punched Bryant in the head and face "like a dribble [*sic*]," about five or six times, with both hands. Walker said to Williams, "Please stop beating on him before you kill him." T.93. Williams retorted that he "meant to kill him" because Bryant "owed him ten dollars for some drugs." T.95. Walker heard Bryant tell Williams that he would try to get his money. Walker also told Williams that she was going to call the police on him. In response, Williams cursed at her, calling her a "bitch" and a "whore." He told her to "go ahead . . . do what [you] have to do[.]" T.94.

At some point, Williams stopped punching Bryant and walked across the street to the Wakefield Grocery Store, from which Johnson was exiting. T.97. A few minutes later, Williams

---

[2] *United States v. Wade*, 388 U.S. 218, 228 (1967).

returned to the scene, pumping his fists in the air like "somebody that won a battle." T.98. He walked over to the prone victim, adjusted his head and then kicked him in the head twice. T.99. Williams then jumped on the victim's chest and stomach and then "started that - - that fist moving thing again." T.99.

Once Walker and Johnson realized that they did not have ten dollars to pay for the victim's debt, they went over to a drug store and attempted to call the police but were unable to use the pay phone. By the time they returned to the scene, the police had already arrived. T.101.

Johnson testified that as she was driving to the store with her aunt, she noticed two black men wrestling in the street at the corner of Holden and Wakefield. T.194. She said that Williams, who was wearing black pants, black "sneaker boots," a white T-shirt, and a red jacket, was on top of the other man. T.197. Williams "straddled" the other man, punched him with both hands "[a]t least ten to fifteen times," and choked him. T.198.  Johnson stated that the victim was not punching back. Johnson confirmed that when Walker told Williams to stop before he killed the man, Williams said, "That's what I want to do." T.199.

When Johnson returned to the scene after attempting to call the police, Williams had "come back to the body and stomping him and kicking him[.]" T.201. The victim was "flat on his back" as Williams "jumped up and down on his stomach with one foot, and in his face," "quite a few times." T.202. At that point, Johnson and Walker went to another location to try to call the police. Johnson testified that she never observed the victim choking Williams, and she never saw both men choking each other simultaneously. T.204.

Dr. Baik, the medical examiner, testified that the cause of death was a blunt force injury to the head and neck area. There was a "triangular shaped abrasion" on the right side of the face

which appeared to have been "inflicted with [a] sharp end of a shoe." T.328. There were

numerous bruises on the victim's head and face and there was external trauma to the victim's

neck. The victim also had three broken teeth and one missing tooth. The cerebellum

demonstrated a prominent pressure cone; the significance of this was that "after the head injury

he was beaten so many times and . . . there is no other way for the brain to go, it's moving to the

central part of the brain[.]" Dr. Baik testified that, to a reasonable degree of medical surgery,

Bryant died of blunt force trauma to the head and neck area, which could have been caused by a

blunt object or a fist or by kicking. T.338. Although there was evidence that Bryant had been

choked for a period of time, the cause of death was *not* strangulation. T.339. The medical records

indicated that the doctors had inserted a chest tube while Bryant was being treated at the

emergency room, so he was alive for a short period of time after the beating. T.339. The

toxicology reports indicated that the victim had used an unknown amount of cocaine prior to his

death. T.340. Dr. Baik opined that cocaine use did not cause swelling of the brain and stated that

the victim's cocaine use did not contribute to the cause of death. T.348-49.

Alice Kirk ("Kirk") testified for the defense that her next-door neighbor was Sharon

Garland ("Garland"), Williams's aunt. T.374. Williams used to live at Garland's house; Kirk

knew him as "one of the neighborhood children." Kirk stated that on the evening of the incident,

two people ran past her house. T.375. When she looked down the street, she could see them

standing on the corner and they appeared to be "children wrassling [*sic*] . . . playing around in

the snow." T.375, 388. Kirk later learned that something more serious was going on when her

niece, Erica Brown ("Brown"), came in the house and told her "to call the rescue squad, they

can't get the little boy to wake up." T.376. Kirk then looked out her window and saw one of the

individuals administering CPR to the other person; she was not able to identify them but she

could "clearly see what they were doing." *Id.* Kirk averred that the person doing CPR was not

emergency medical personnel since it was before the ambulance arrived. T.377.

On cross-examination, the prosecutor asked Kirk whether it was true that she never said

anything to him or to the police about witnessing one of the individuals performing CPR. T.392-

93. Kirk stated she did not recall. T.393. After argument out of the presence of the jury and over

defense counsel's strenuous hearsay objection, the trial court allowed the prosecutor to introduce

the tape of Kirk's 911 call to refresh her recollection as to whether she said to the operator, "Are

they still beating him?" in response to Brown's observation that one of the individuals on the

corner was being beaten. *See* T.393-406. Kirk testified that she never personally observed

anyone beating anyone else at the corner of Wakefield and Holden that night. T.409. Kirk

admitted that she had a criminal record, including convictions for petit larceny, disorderly

conduct, and obtaining public assistance by fraud. T.407-09.

Valerie Patterson ("Patterson") testified for the defense that Williams was her cousin and

that he stayed "off and on" at Garland's house. T.410-11. Patterson testified that she also was

living with her son at Garland's house. T.411. Patterson testified that Williams had received a

teal, green and orange Miami Dolphins jacket for Christmas that year and that after he received

it, she never observed him wearing any other colored jackets. T.413. Patterson stated that,

sometime between 7 p.m. and 9 p.m., Williams came into the house and took her into the

kitchen. He was wearing his Miami Dolphins jacket. T.414. Patterson said that he was "nervous"

and "sweating" and "crying," and he appeared to have scratches around his chin area and his

neck. T.414, 421. Williams said that he had "been in a fight and he didn't really know what was

going on, but he wanted [her] to go outside and check to see if everything was all right." T.416.

Williams told her that he tried to help the person with whom he was fighting get up by

administering CPR, but "the guy didn't get up." T.417. On cross-examination, Patterson

admitted that Williams did not say anything about choking or strangling. T.421. Patterson denied

that she told defense counsel that an individual named Antoine Parker gave somebody CPR that

night. T.422.

Verniata Britt ("Britt"), Williams's mother, testified for the defense that Williams lived

with her sister, Sharon Garland. Britt stated that she had bought Williams a Miami Dolphins

jacket for Christmas and that she knew that he did not own a red jacket. When she saw Williams

on the day after the incident, he was wearing the Miami Dolphins jacket. He told her that he had

"gotten in a fight with someone" and that "something bad happened." T.437. He did not say that

he had killed someone. *Id.* Britt admitted that she had been convicted of attempted petit larceny

for the misuse of food stamps. She admitted that she lied on her application for welfare benefits

by not disclosing that she was employed and had pled guilty to third degree grand larceny

regarding this welfare fraud. T.442-43.

Garland, Williams's aunt, testified for the defense that Williams was her nephew and that

he stayed at her house frequently. T.447. She testified that she never observed Williams wearing

a red jacket and that he did not have one at her house. T.448.

Williams, who was eighteen years-old at the time of the incident, testified that prior to

the altercation with Bryant, he had never been convicted of a crime. Prior to trial he pled guilty

to the attempted unauthorized use of a motor vehicle, a misdemeanor. T.461. Williams denied

that he owned a red jacket or black sneaker boots. T.464. He testified that he received CPR

training when he was working as a lifeguard in a summer youth program several years ago.

T.466. Williams knew Bryant from the neighborhood, where he saw Bryant "bully a couple

people around" and "get in fights with a couple store owners." T.468. According to Williams,

Bryant's drug use was "just a big joke to him" since he routinely would get high out in public.

*Id.*

Williams recounted the events of the night of January 6 consistently with his statement to

the police given, in the presence of counsel, when he voluntarily turned himself in.[3] In support of

a justification defense, Williams testified that he and the victim had argued about the fact that

Bryant had sold him a "messed up VCR" and would not refund his money. T.473. Bryant said,

"You all think because I get down that you all can just run over me." *Id.* Then Bryant "walked

up, snatched [his] necklace and . . . whacked [him]" " right in the eye[.]" T.473-74. Williams

stated that he was wearing his Miami Dolphins jacket, teal green pants, and brown boots that

night. T.474. Williams chased Bryant and eventually caught up with him. As he grabbed his

---

[3] Williams's statement to the police read in relevant part as follows: "What actually happened was, I was at a friend of mine's house at 24 Wakefield. Daryl [Bryant] walks in. He owed me money because he sold me a non-working VCR. He was supposed to be paying me back a little, little by little. I paid him sixty dollars for the VCR. Daryl told me then that he didn't have it. I was on my way out the door and Daryl was talking to my friend in the back room. As I was leaving out, Daryl was leaving right behind me. We walked the same way up Wakefield. We got to the middle of the block and he turned to the side and said I shouldn't have to pay you nothing. We were still walking, and I told him that he sold me a messed up VCR, I should be able to get my money back. By this time we were about in front of 58 Wakefield and he turns to the side and grabs me by my throat. I tried to jump back to get away. He snatched my gold necklace and started to run up the street. I got up and chased him. As we got to the corner of Wakefield and Holden I saw some friends and I yelled to Antoine, stop him. Daryl stopped to let a car go past and he tried to continue running but I caught up to him. I grabbed his hand and grabbed my necklace out of his hand. He hit me again and that's how the fight started. . . . As we were fighting, he got on top of me. He put his knees on my shoulders and started to choke me. I waved my arm up and I hit him because he was choking me and I couldn't breathe. When I hit him we fell side to side in the snow. I grabbed him by the throat and he still had me by the throat, we was choking each other for at least two or three minutes. I let him go because I didn't feel no more force to my [*sic*] neck and he wasn't moving. When I seen that he wasn't moving, I turned him over on his back. I seen that he wasn't breathing and I gave him CPR for about three minutes. I'm a Red Cross trainee for CPR. I got up and was walking around in a daze. . . . I just stared at him and left everything there, my gold chain, the money in my pocket that fell out when we were fighting. I stood there for a while and walked home. . . ." T.281-84.

necklace back, Bryant "whacked [him] again," and that was when the fight started. Williams claimed that at that point, he had not thrown any punches; Bryant started kneeing him, and they fell to the ground, at which point Bryant started choking him. In a "last minute burst of energy," Williams "just slid [his] arm under and hit him" in the temple and "slam[med] him to the ground." T.476. According to Williams, they were "rolling around in a circle" and Bryant had both hands wrapped around his neck. T.477. Williams stated that he believed that Bryant "would have killed [him]." *Id.* Williams testified that when he "felt the pressure slowly sliding off [his] neck," he let Bryant go. T.478. At that point, Williams realized there was "something wrong" so be started doing CPR on Bryant. He testified that he "panicked" and was telling the people around him to call an ambulance. Williams stated that he did not wait to talk to the police because he was "paranoid" that they were going to arrest him. T.481-82. He stated that he did not intend to kill or seriously injure Bryant and that he only hit him once. T.478-79, 486.

The jury convicted Williams of second degree murder as charged in the indictment. He was sentenced to twenty-five years to life in prison. Represented by new counsel, Williams brought a motion to vacate the judgment pursuant to New York Criminal Procedure Law § 330.30 alleging that trial counsel was ineffective. The trial court denied Williams's application. The Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed his conviction on direct appeal. *People v. Williams*, 273 A.D.2d 824, 710 N.Y.S.2d 214 (App. Div. 4th Dept.), *leave denied*, 95 N.Y.2d 893, 738 N.E.2d 790, 715 N.Y.S.2d 386 (N.Y. 2000). This habeas petition followed. For the reasons set forth below, Williams's request for a writ of habeas corpus is denied.

### III.    Discussion

A.      **Standard of Review**

To prevail under 28 U.S.C. § 2254, as amended in 1996, a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication of his federal constitutional claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

B.      **Merits of the Petition**

1.      **Ineffective Assistance of Trial Counsel**

Williams contends that trial counsel committed several errors that were so serious as to prejudice his right to a fair trial and deny him the effective assistance of counsel as guaranteed by the Sixth Amendment. Williams has asserted a long list of alleged errors; in particular, Williams faults counsel for (1) failing to call an expert witness to testify that the cocaine present in the victim's body contributed to his death; (2) failing to call eyewitnesses in his behalf; (3) failing to properly cross-examine Walker and to move for a mistrial based upon her testimony; and (4) failing to argue that Williams acted in self-defense.

a.      **Legal Standard**

In order to prevail on a claim of ineffective assistance of counsel within the framework established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), a habeas petitioner must satisfy a two-part test. First, the petitioner must demonstrate that counsel's performance was so deficient that counsel was not functioning as "counsel" within the meaning of the Sixth Amendment to the Constitution. *Id.* at 688. In other words, the petitioner must show

that his attorney's performance "fell below an objective standard of reasonableness." *Id.* Second,

the petitioner must show that counsel's deficient performance prejudiced him. *Id.* at 694. To

establish the "prejudice" prong of the *Strickland* test, the petitioner must show that a "reasonable

probability" exists that, but for counsel's error, the outcome of the trial would have been

different. *Id.* at 694.  The issue of prejudice need not be addressed, however, if a petitioner is

unable to demonstrate first that his counsel's performance was inadequate. *Id.* at 697 ("[T]here is

no reason for a court deciding an ineffective assistance claim to . . . address both components of

the inquiry if the defendant makes an insufficient showing on one.").

### b.    Alleged Grounds of Ineffectiveness

### 1.)    Failure to Call Expert Witness

Williams contends that trial counsel should have retained an expert witness to testify that

the victim's ingestion of cocaine prior to the incident affected his behavior and contributed to his

death. When reviewing trial counsel's performance, a habeas corpus court must be "highly

deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range

of reasonable professional assistance." *Id.* at 689. The court must not rely upon hindsight and

second-guess counsel's unsuccessful trial strategy. *Id.* Indeed, "strategic choices made after

thorough investigation of law and facts relevant to plausible options are virtually

unchallengeable[.]" *Id.* at 689-90. The Second Circuit has held that "the decision to call or

bypass particular witnesses is peculiarly a question of trial strategy, *United States v. Matalon*,

445 F.2d 1215, 1219 (2d Cir.), *cert. denied*, 404 U.S. 853 (1971), which courts will practically

never second-guess." *United States ex rel. Walker v. Henderson*, 492 F.2d 1311, 1314 (2d Cir.

1974). "'Where an expert would only marginally assist the jury in its role as fact finder, an

attorney's decision not to call an expert is more likely to fall within the bounds of reasonable performance and less likely to prejudice the defendant.'" *Massaro v. United States*, No. 97 Civ.2971 MGC, 2004 WL 2251679, at *4 (S.D.N.Y. Oct. 5, 2004) (quoting *United States v. Aliotta*,  No. 97 Cr. 311, 1998 WL 43015, at *3 (S.D.N.Y. Feb. 3, 1998)).

The toxicology results introduced at trial showed that the victim had cocaine in his system. According to Williams, an expert should have testified to the effects of cocaine on the victim's behavior, which purportedly would have explained the victim's "bizarre behavior" and would have "corroborate[d] [Williams's] testimony that the deceased was the initial aggressor." Petitioner's Appellate Brief at 5, attached as part of Respondent's Appendix of Exhibits. Defense counsel proceeded on the theory that Bryant, the victim, grabbed a necklace from Williams's neck and then ran away. Williams gave chase and, when he caught up with Bryant, Bryant grabbed his neck and allegedly started choking him. Williams testified that he choked Bryant only because Bryant was choking him and that he let go as soon as Bryant went limp. If the jury credited this testimony, it would have been sufficient for him to prevail on a defense of justification. As respondent argues, the possible effects of cocaine on Bryant's behavior would have been of dubious relevance since the conduct Williams attributed to him (grabbing the necklace and running away) was not "aberrant behavior sufficient to cause fear and to warrant a forceful response[.]" *Cf. People v. Chevalier*, 220 A.D.2d 114, 117,  644 N.Y.S.2d 508 (App. Div. 1st Dept. 1996) ("Since [the victim's] recent drug use was a potentially powerful objective causal factor of his purportedly 'crazy' conduct, and since a person under the influence of both alcohol and drugs might well be perceived–even by an observer unaware of the cause of the conduct–as acting more dangerously than one who had merely been drinking, the evidence of

-11-

[the victim's] drug use was admissible and relevant to the justification defense.").  Here, it was reasonable for defense counsel to make the strategic decision not to call an expert witness to present testimony concerning the effects of cocaine on the victim's behavior, particularly because Williams had never alleged that the victim had been exhibiting aberrant, potentially drug-induced conduct.

Williams also argues that there was medical literature that would have supported the contention that cocaine actually contributed to the victim's death. Williams points out that the medical examiner testified that the deceased exhibited swelling of the brain, a condition which he attributed to blunt force trauma. On direct appeal, appellate counsel argued that trial counsel should have introduced "scientific evidence that cocaine can cause brain swelling, and furthermore, that cocaine use can cause sudden death after a brief struggle." Petitioner's Appellate Brief at 24, attached as part of Respondent's Appendix of Exhibits. The medical literature that appellate counsel cited in support of this proposition was not on point, however, since all of the articles discussed the effects of cocaine-use on individuals who suffered cerebral *hemorrhage*, not cerebral swelling. *See id.* (citing, *e.g.*, Nolte & Gelman, "Intercerebral Hemorrhage Associated With Cocaine Abuse," Archives of Pathology and Laboratory Medicine, Vol 113, page 812 (July 1989)). Furthermore, there was no evidence of how much cocaine the victim had ingested prior to the incident or when he had ingested it. In any event, after reviewing the trial transcript, it is apparent that the evidence that the victim suffered blunt force trauma to the head and face was overwhelming. Thus, the Court is doubtful that Williams could have found an expert who would have testified to a reasonable degree of medical certainty that the victim died from cocaine-induced swelling of the brain, and that the blunt force trauma did not

-12-

contribute to the cause of death.

### 2.)   Failure to "control" cross-examination of a witness

Williams faults counsel for failing to "control" his cross-examination of Dorothy Walker, who was a somewhat difficult witness due the fact that she frequently rambled on when responding to questions. For instance, she was extremely concerned with keeping her medical condition private and became offended that defense counsel asked her whether she had been drinking alcohol before she observed the incident at issue. T.148.T.555-58. However, Walker also proved to be a difficult witness for the prosecutor. *E.g.*, T.98, 100.

On direct appeal, the state court "agree[d] with defendant that [Walker] was difficult and made certain prejudicial remarks," but it "reject[ed] his contention that defense counsel's actions with respect to that witness deprived him of meaningful representation[.]" *People v. Williams*, 273 A.D.2d 824, 710 N.Y.S.2d at 215 (citing *People v. Baldi*, 54 N.Y.2d 137, 147, 444 N.Y.S.2d 893, 429 N.E.2d 400 (N.Y. 1981)). The state court found that although defense counsel's representation "was not error free," his conduct, "viewed either with respect to specific alleged errors or as a whole, did not rise to the level of egregious and prejudicial conduct . . . necessary to prevail on an ineffective assistance of counsel claim[.]" *Id.* (quotation and citation omitted).

On a few occasions during her cross-examination, Walker made non-responsive comments that, Williams argues, implied that he "would use violence against anyone who testified against him[.]" Petitioner's Habeas Corpus Brief at 4 (Docket #2) (citing T.111) ("Q: And what church to you belong to, ma'am? A: I rather not say, I don't want to get hurt.). Williams concedes that during one exchange, defense counsel made an objection that Walker's answer was non-responsive, but he faults counsel for not moving to strike or request a curative

instruction.

As a matter of trial strategy, counsel may not have wanted to draw attention to Walker's expressions of concern for her and others' safety. Rather than objecting to each of Walker's tangential remarks, which likely would have had the effect of highlighting their importance in the jury's mind, trial counsel largely ignored Walker's comments and merely asked the trial court to instruct Walker to answer the questions put to her. This was a reasonable strategy for conveying to the jury the impression that Walker had an unfounded and exaggerated fear that the petitioner would retaliate against her or others simply because she appeared in court to testify. As discussed elsewhere in this opinion, defense counsel was effective in keeping from the jury Walker's allegations that she had been threatened at gunpoint by individuals claiming to be associates of the petitioner. Allowing Walker to ramble may have worked to defense counsel's advantage, since it arguably supported the notion that Walker's mind was scattered and that she was unable to accurately perceive and relate what she claimed to have witnessed. Defense counsel pointed out that Walker did not know whether she was nearsighted or farsighted or whether she was required by law to wear corrective lenses while she was driving. Walker's inability to focus her attention while testifying was another way for defense counsel to argue that Walker did not display the qualities of a reliable witness.

In the context of this argument, Williams also faults defense counsel for failing to obtain Walker's records from the Department of Motor Vehicles regarding whether or not she was required to wear corrective lenses while driving. Defense counsel had already demonstrated that Walker wore glasses, that she took them off and on during different periods of making her observations of the incident, that she inaccurately described petitioner's height and weight, and

that she failed to identify petitioner soon after the commission of the crime. It would have been better practice to have obtained evidence from the Department of Motor Vehicles to show that Walker was required to wear corrective lenses for driving if, indeed, such evidence existed. Nevertheless, counsel's failure to bring this evidence before the jury was harmless because he was effectively able to argue that her vision was impaired, based on her testimony that she did wear glasses while driving and while observing the incident.

### 3.)   Failure to call certain witnesses

Williams complains that trial counsel failed to secure the testimony of a number of alleged witnesses to the murder: Shaneenla McKeachin, Ladonna Billingslea, Martinez Pitts, Antoine Parker, Darryl Spells, Darryl Scott, and Derrick Pitts.

### a.)   Darryl Scott, Darryl Spells and Derrick Pitts

According to Williams, a "radio transmission of 2002 hrs. that day stated the suspect's name might be 'Darryl [*sic*].'" Docket #2 at 5.  Williams alleges that because there were two individuals named "Daryl" and one individual named "Derrick" at the crime scene, defense counsel should have located these men and interviewed them as potential suspects. In support of this claim, Williams notes that Walker testified at trial that she heard somebody call out the name "Daryl." As an initial matter, the Court notes that the more reasonable inference to be drawn from the testimony that an unknown person called out the name "Daryl" at the time of the incident is that the person was referring to the victim (whose first name was "Daryl"), not his assailant. Furthermore, a defense of misidentification was precluded by Williams's statement to the police in which he asserted that no one else participated in the fight and that when he was leaving the scene, "the police were all coming around the corner." T.284. Moreover, Williams

testified at trial that from the time Bryant allegedly snatched his necklace until the time he saw

the police rounding the corner, he was the only one involved in the altercation. T.545-57. Thus, a

defense of misidentification readily would have been perceived by the jury as an attempt to raise

a false issue. Williams cannot demonstrate the absence of a legitimate trial strategy in defense

counsel's decision not to pursue a defense a misidentification, and counsel therefore was not

deficient in failing to locate these alleged witnesses.

### b.)    Martinez Pitts and Shaneenla McKeachin

Williams contends that Pitts and McKeachin would have supported his justification

defense. According to Williams, Pitts would have testified that he did not see Williams kick

Bryant and that he did see Bryant grab Williams's neck. McKeachin apparently submitted an

affidavit that she saw Bryant hit Williams in the upper part of his body; Williams then hit

Bryant, who fell to the ground. At that point, McKeachin left the scene and went to Garland's

house to get help. Supposedly, "a few seconds later," Williams came into the kitchen and fell to

the floor, crying.

Williams contends that McKeachin's testimony would have established that Bryant was

the initial aggressor. Whether or not the victim was the initial aggressor does not necessarily

matter to the defense of justification since, in order to prevail on such a defense, a defendant

must show both that "the defendant acted under a subjective impression of danger and that this

impression was objectively reasonable under the circumstances perceived by the defendant."

*People v. Chevalier*, 220 A.D.2d at 116 (citing *People v. Goetz*, 68 NY2d 96, 111-12 (N.Y.

1986)); *see also* N.Y. Penal Law § 35.15(2)(a) ("[T]he actor may not use deadly physical force if

he knows that he can with complete safety as to himself and others avoid the necessity of doing

-16-

so by retreating[.]"). Said another way, even if a defendant were the initial aggressor, the amount

of force that he used to repel an attack might exceed the force necessary to do so, and thereby

place the defendant's conduct outside the purview of Penal Law § 35.15(2).  Thus, even if her

initial observations were correct, they are immaterial because she did not observe the entire fight.

For this reason, defense counsel reasonably decided not to call her as a witness.

Pitts's grand jury testimony concerning his observations was extremely vague and

equivocal. *See* Appendix on Direct Appeal at 72-72 ("Q: When he grabbed him to his neck, did

he reach Jameel's neck? A: I think he did, yes. . . . Q: Did you see him squeeze Jameel's neck?

A: I didn't see actual detail of it. . . .Q: You don't recall if he [petitioner] was able to get his [the

victim's] hands away from his neck? A: No, because I had went [*sic*] to the store at the time.");

*id.* at 74 ("A: His [the victim's] hands wasn't [*sic*] actually there for a long time, you know what

I'm saying?), part of the State Court Records submitted by Respondent. Defense counsel

reasonably decided not to call Pitts as a witness since his testimony would not have added

anything to the justification defense.

### c.)       Ladonna Billingslea

Billingslea provided an affidavit stating that when she saw Williams at about 2:30 p.m.

on the day of the incident, he was wearing a blue Miami Dolphins jacket. Also, Billingslea

related a conversation that she had with a police officer on January 27, 1996. That officer

allegedly told her that he had been informed by other officers "that a gang of people jumped on

Mr. Bryant at the corner of Wakefield and Holden." *See* Appendix on Direct Appeal at 108-09,

part of the State Court Records submitted by Respondent. Her observations about Williams's

jacket color were cumulative to the testimony provided by several other defense witnesses.

Furthermore, her prospective testimony that she was told by an officer who was told by other officers that Bryant was "jumped" by a "gang" was double-hearsay and would have been inadmissible. As a result, it was a legitimate strategic decision for defense counsel to refrain from calling this impeachment-prone, convicted felon as a witness.

### 4.)      Failure to move for a mistrial

Williams faults trial counsel for failing to move for a mistrial "due to prosecution's suggestive in-court identification." Petitioner's Memorandum of Law at 7 (Docket #2). He apparently is arguing that trial counsel should have moved for a mistrial following Walker's in-court identification of him as the victim's assailant on the basis that Walker had been unable to identify Williams in a pre-trial photo array. As respondent points out, the claim is unexhausted because it was not raised in the state court on direct appeal or collaterally. However, it arguably is procedurally defaulted because it could have been raised on direct appeal since Williams had new appellate counsel and the alleged error was apparent on the record. In any event, even if Williams had objected and Walker's in-court identification was stricken, the jury still was entitled to consider the pre-trial and in-court identifications made by Johnson, Walker's niece, whose testimony defense counsel was unable to undermine on cross-examination. Thus, Williams was not prejudiced by defense counsel's failure to object on this basis.

### 5.)      Failure to argue that petitioner acted in self-defense

Williams contends that trial counsel was ineffective due to his alleged failure, in Williams's words, to "exploit the testimony" of prosecution witness Walker, who testified that she observed the victim pull Williams's scrotum. However, Williams did not testify at trial that he used deadly physical force to repel such a grab; rather, he stated that he believed that he had

to use deadly physical force against Bryant at the time that Bryant allegedly had both of his hands around Williams's neck and was attempting to strangle him. T.477-78, 517-18. Under New York law, a defendant is justified in using deadly force in his own defense when it is reasonable to believe that another person is about to use deadly physical force against him and that such deadly physical force is necessary to prevent serious physical injury or death to himself; to disprove justification, the prosecution need only disprove one of these elements beyond reasonable doubt. Even in such a case, however, the actor may not use deadly physical force if he knows that with complete personal safety, to oneself and to others, he may avoid the necessity of so doing by retreating. *See* N.Y. Penal Law § 35.15(1), (2)(a).  To argue, as Williams urges, that he would have been reasonable in using deadly force in response to having his scrotum grabbed, was inherently implausible. Indeed, it arguably would have been deficient performance for trial counsel to advance such a baseless argument.

### 6.)    "[N]umerous other error and omissions"

Williams asserts that even if this Court rejects the arguments set forth above, "the totality of circumstances nevertheless requires of a finding of ineffectiveness." Petitioner's Memorandum of Law at 9 (Docket #2). Williams then goes on to list "a few additional point[s]" of alleged error. The Court will consider them in turn.

### a.)    Failure to introduce receipt for a blue jacket

Williams faults counsel for failing to introduce into evidence a receipt indicating that Williams's mother had purchased a blue Miami Dolphins jacket for him, which would have "bolster[ed]" his testimony that he wore a blue jacket rather than a red jacket (that was allegedly worn by attacker) on the day of the incident. Whether or not his mother had purchased a blue

jacket for him was not in any way relevant to, or probative of, what he actually was wearing at the time of the crime. Had counsel attempted to introduce this evidence, the trial court in all likelihood would have sustained the prosecutor's objection on relevancy grounds. In any event, several defense witnesses testified that Williams did not own a red jacket (as the two eyewitnesses testified that the perpetrator was wearing) and that they saw him wearing the blue Miami Dolphins jacket on the day of the incident.

> **b.)**      **Failure to object to question regarding motive for murder**

Williams contends that trial counsel erred in failing to object "to a leading and repetitious question to Dorothy Walker about the Petitioner's alleged motive for the killing." Petitioner's Memorandum of Law at 9 (Docket #2). Unfortunately, Williams has not provided a citation to the trial transcript. The Court assumes that Williams is referring to the prosecutor's question to Walker on direct examination, "Why?" after Walker had testified that Williams said that he "meant to kill [the victim]." T.95. If this is the offending question, it is in fact not leading, but open-ended. Rather, a more appropriate objection would have been that the witness lacked personal knowledge.  This objection, however, would have simply led the questioner to what Williams had said with respect to his motive and the statement would have been admissible as an admission. Indeed, the prosecutor was permitted to ask what other admissions Williams made during the altercation, so Walker ultimately would have been able to testify that Williams said that the victim owed him ten dollars for some drugs. Thus, Williams was not prejudiced by counsel's omission.

> **c.)**      **Failure to object to witness testimony regarding fear of retaliation**

Williams contends that Walker made "damaging comments" concerning her "fear of

retaliation by the Petitioner." Petitioner's Memorandum of Law at 9 (Docket #2). This claim was addressed earlier in this opinion in the context of Williams's claim that trial counsel did not adequately "control" his cross-examination of Walker. As discussed above, it is without merit.

### d.)        Failure to inquire about a witness's medication

Williams faults defense counsel for failing to ascertain precisely what type of medication Walker was taking on the day that she observed the incident.

> Q:     What kind of medications were you taking on that date?
> A:     Next you going [*sic*] to ask me what's wrong with me. I don't think I should display myself to anybody because I'm not on trial here. . . . And, it was no drugs that would make me all lethargic or nothing like that. A doctor can verify that.

Defense counsel then asked whether the medication she was taking on the day of the incident "in any way impact[ed] on [her] ability to perceive things[.]" Walker replied that "it didn't." T.162. Defense counsel inquired as to the side-effects of her medication, and Walker responded that she "d[id] a lot of urination." T.163.  Counsel then moved on to another area of questioning. While it would have been better practice for defense counsel to have pressed the point and to have objected on the basis that the answer was non-responsive, this Court should not question the strategy employed by defense counsel, who may have been attempting to limit the damage to Williams's case caused by this extremely reluctant and recalcitrant witness.

### e.)        Failure to protect petitioner's right to present testimony

Williams contends that trial counsel failed to properly protect his right to present testimony as to the deceased's reputation for violence. Contrary to Williams's contention, there was extensive argument (outside the presence of the jury) concerning Williams's ability to testify as to the victim's reputation for violence. *See* T.361 *et seq.* As discussed later in this

opinion in the context of Williams's assertion that the trial court erred in precluding him from testifying about the victim's reputation for violence, the claim lacks a factual basis; Williams ultimately was permitted to testify before the jury as to his knowledge concerning the deceased's allegedly violent reputation.

**f.)**        **Failure to object to leading question**

Williams contends that trial counsel was ineffective in failing to object to "a leading question on the critical issue of whether the Petitioner had been warned to stop beating the deceased." Petitioner's Memorandum of Law at 10 (Docket #2). Williams is apparently referring to the testimony of Walker, who stated that she warned Williams twice to stop beating up the victim because the victim was going to die. The first time that Walker so testified, it was in response to an open-ended question. Later in her testimony, when the prosecutor was attempting to elicit the substance of her second warning, he asked her, "Did you warn him again about killing someone?" Arguably, this question is not leading, and falls into that gray area where the form of the question sounds as though it is suggesting an answer, but falls short of such an offense.  The test of a leading question is whether the question suggests the answer. *See People v. Mather*, 4 Wend. 229 (N.Y. 1830) (holding that "a question to a witness is leading when it plainly suggests the answer which the party puts to him," and the "mere stating of the question in the alternative form, as whether or not a party did a certain act, specifying it, does not remove the objection to its being leading"). This question appears only to serve as a combination of refreshing recollection and the seeking of a substantive answer. *See Cheeney v. Arnold*, 18 Barb. 434 (N.Y. 1854) ("Leading questions are permitted, even in a direct examination, where an omission in the witness' testimony is evidently caused by a want of recollection, which a

-22-

suggestion may assist.").  It does not suggest to the witness the actual words she may have spoken at the time. While this encounter presents a close case, on balance, it was not error for counsel to ask such a question, in light the context of the question. Thus, Williams was not prejudiced by defense counsel's omission in this respect.

### g.)        Failure to object to introduction of autopsy photographs

Williams assails trial counsel for failing to object to the introduction of "several gruesome autopsy photos" which he claims had the effect of inflaming the jury. Because the cause of death was hotly disputed at trial, and because the autopsy pictures were relevant on this issue, they were properly admitted for that limited purpose. *See, e.g.*, *People v. Campbell*, 247 A.D.2d 277, 668 N.Y.S.2d 616, 616-17 (App. Div. 1st Dept. 1998) ("The trial court providently exercised its discretion in admitting autopsy photographs into evidence since they were relevant to material facts in issue, they tended to disprove the defense, and they illustrated and corroborated the Medical Examiner's testimony as to her observations at the time of the autopsy[.]") (citation omitted). As a result, a motion to exclude the photographs in all likelihood would have been unsuccessful. Therefore, Williams was not prejudiced by trial counsel's failure to object.

### h.)        Failure to object to commencement of jury deliberations

Williams contends that trial counsel should have objected when the "court clerk, not the court, instructed the jury to commence deliberations." In support of this contention, he cites no federal constitutional law, and the one state law case that he cites, *People v. Eadie*, 83 A.D.2d 773 (App. Div. 4th Dept. 1981), is wholly inapposite. It is true that the conviction was reversed in that case, but it was not because the courtroom deputy instructed the jury; rather, it was because

the deputy was told "to inform the jury that if they had not reached a verdict, they would be

sequestered for the night." The court in *Eadie* found that it was possible that the jury interpreted

the remarks as coercive and prejudicial and, moreover, neither defendant nor defense counsel

was present. None of these facts were present here, and this claim is entirely without merit.

### i.)      Failure to properly clarify request for instructions

Finally, Williams asserts that when the jury requested clarification regarding the elements

of murder and manslaughter, trial counsel erroneously "failed to insist that the Court instruct

them that the Prosecution must prove beyond a reasonable doubt that the Petitioner did not act in

self-defense." Petitioner's Memorandum of Law at 10 (Docket #2). Williams does not dispute

that the trial court, during its main charge, did properly instruct the jury that the prosecution was

required to disprove, beyond a reasonable doubt, his defense of justification. Thus, there was no

error by trial counsel in this regard.

### 2.      Prosecutorial misconduct

The habeas court's scope of review as to claims of prosecutorial misconduct is quite

limited. In order to overturn a conviction, the Court would have to find that the prosecutor's

comments constituted more than mere trial error and instead were so egregious as to violate the

petitioner's due process rights. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 647-48 (1974);

*Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990) ("The appropriate standard of review for a

claim of prosecutorial misconduct on a writ of habeas corpus is the narrow one of due process,

and not the broad exercise of supervisory power.") (internal quotation marks and citations

omitted); *accord Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998).

Thus, to be entitled to relief, Williams must show that he "'suffered actual prejudice

because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict.'" *Tankleff*, 135 F.3d at 252 (quoting *Bentley v. Scully*, 41 F.3d 818, 823 (2d Cir. 1994) (internal quotation marks and citation omitted in original)). "Rarely are comments in a prosecutor's summation 'so prejudicial that a new trial is required.'" *United States v. Germosen*, 139 F.3d 120, 128 (2d Cir. 1998) (quoting *United States v. Forlorma*, 94 F.3d 91, 93 (2d Cir. 1996) (quotations omitted)), *cert. denied*, 525 U.S. 1083 (1999). Reversal of a defendant's conviction is warranted only where "'the statements, viewed against the entire argument before the jury, deprived the defendant of a fair trial.'" *Id.* (quoting *Forlorma*, 94 F.3d at 94). In determining whether a defendant has suffered actual prejudice as a result of the prosecutorial misconduct, the reviewing court considers "'the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements.'" *Floyd*, 907 F.2d at 355 (quoting *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir.1981) (*per curiam*)); *accord*, *e.g.*, *Germosen*, 139 F.3d at 128; *United States v. Miller*, 116 F.3d 641, 683 (2d Cir. 1997). The court also must take into account defense counsel's remarks made during his summation. *United States v. Young*, 470 U.S. 1, 11-12 (1985). Moreover, where the defendant did not object to the remarks at trial, reversal is warranted only where the remarks "were so substantially prejudicial as to constitute 'flagrant abuse.'" *United States v. Russo*, 302 F.3d 37, 47 (2d Cir. 2002) (quoting *Germosen*, 139 F.3d at 128).

The first instance of alleged misconduct occurred in response to defense counsel's attack on the prosecutor for not introducing into evidence results of police forensic tests on samples of the deceased's fingernail clippings and a ski hat found at the crime scene. T.563-64, 566. Defense counsel suggested to the jury that important evidence was being withheld from them

deliberately by the prosecution. Without revealing what the test results were, the prosecutor maintained that it was unnecessary to introduce evidence of such negligible value in the case. T.570-71. The prosecutor's remark was a fair response to defense counsel's suggestion that the evidence was being improperly withheld.

In response to defense counsel's argument regarding the discrepancies in the witnesses' description of Williams as the assailant, the prosecutor commented, "Recognition and description. The way that human beings identify one another is through recognition, not description." T.573. Williams contends that the prosecutor improperly presented "expert psychological testimony."  As an initial matter, while the Court does not necessarily agree with the prosecutor's observations concerning human behavior in identification testimony, the Court is dubious that this comment constituted "expert testimony"; rather, it was nothing more than a lay person's permissible observation about human behavior. In any event, even if it was error, it did not prejudice Williams's right to a fair trial. The Court disagrees that this "testimony" was "critical in rehabilitating the prosecution's witnesses who gave inexact descriptions of the suspect."  There was no need to rehabilitate Johnson's testimony regarding her identification of Williams. Walker's identification testimony admittedly was less precise but, in the end, identification was not a critical issue in the case:  Williams admitted to being in an altercation with the victim, and he maintained that no one else was involved in the fight.

Last, Williams contends that the prosecutor infringed upon his Fifth Amendment right to remain silent and improperly shifted the burden of proof. When discussing how to evaluate witness testimony, the prosecutor said, "Ask yourself another question. When did the witness come forward with his or her information?" T.576. Williams contends that "[a] few sentences later, the Prosecutor makes it clear that he is referring to the Petitioner," and he points to the

-26-

following comment as being improper: "When you apply those tests you're going to see where the truth resides. It resides not in what the defendant said he did . . . at the Buffalo Police Department, or yesterday in this courtroom. The truth resides in what the defendant said and did on January 6th of 1995." T.577.  This remark was wholly unobjectionable; it merely was the prosecutor's argument regarding which witnesses' testimony the jury should credit. Moreover, Williams voluntarily waived his right to remain silent when he agreed to give a statement to the police.

In sum, the Court does not find that any of the challenged remarks were improper, let alone the type of egregious misconduct that would justify reversal of petitioner's conviction. Even if these remarks were erroneous, which this Court does not find to be the case, habeas relief still would not be warranted in light of the overwhelming evidence of Williams's guilt.

3.    **Trial court error**

The Supreme Court has held that the opportunity to present a defense is one of the constitutional requirements of a fair trial. *See*, *e.g.*, *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.") (internal quotation marks and citations omitted); *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987) (right to present defense includes right of defendant to testify). Federal habeas review of a state court conviction is limited to determining whether there were errors of federal constitutional magnitude that denied the petitioner his right to a fundamentally fair trial. *Cupp v. Naughten*, 414 U.S. 141, 146 (1973); 28 U.S.C. § 2254(a). Thus, habeas relief will not lie to rectify errors of state constitutional, statutory, or procedural law unless a federal constitutional issue is also presented. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (A federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of

-27-

the United States;" it is not the province of a federal habeas court to re-examine state court determinations of state law.). Generally, alleged evidentiary errors by a state trial court do not rise to the level of a federal constitutional violation. *See id.*; *Lipinski v. People of New York*, 557 F.2d 289, 292 (2d Cir. 1977) ("The states have traditionally been accorded great latitude in determining rules of evidence to govern proceedings in their own courts. In this sensitive area, characterized by delicate and interrelated judgments of fairness and efficiency, the federal courts have trod lightly to refrain from abrasive disruptions of state procedures and to avoid rigidity in an area of law that should be, above all others, empirical.").

The task for the habeas court is to inquire into possible state evidentiary law errors at the trial level in order to ascertain whether the state court acted within the limits of what is objectively reasonable in finding no constitutional defect existed in petitioner's trial. *Jones v. Stinson*, 229 F.3d 112, 120 (2d Cir. 2000) (citing *Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973) (erroneous exclusion of evidence amounts to constitutional error if it deprives the defendant of a fundamentally fair trial); *see also Rosario v. Kuhlman*, 839 F.2d 918, 924 (2d Cir. 1988) (same)). The Second Circuit has instructed that "whether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends upon whether 'the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *Justice v. Hoke*, 90 F.3d 43, 47 (2d Cir. 1996) (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)); *accord Jones*, 229 F.3d at 120.  "In a close case, 'additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.'" *Jones*, 229 F.3d at 120 (quoting *Agurs*, 427 U.S. at 112 and citing *Hoke*, 90 F.3d at 47 (same)). The Court now turns to the evidentiary errors alleged to have been committed by the trial judge.

      **a.**      **Preclusion of testimony regarding the victim's reputation for violence**

Williams's contention that the trial court precluded him from testifying as to the victim's reputation for violence is belied by the record, which reveals that Williams was permitted to testify extensively regarding the victim's reputation for violence and other bad acts. *See* T.468-70; 510-11; 524; 529-31. Consequently, this claim has no factual or legal basis.

### b.      Failure to charge lesser included offense of criminally negligent homicide

Williams argues that the trial court should have instructed the jury on the lesser included offense of criminally negligent homicide. On direct appeal, the state court held that "[b]ecause the court charged the lesser included offense of manslaughter in the first degree and defendant was convicted of murder in the second degree, defendant is foreclosed from challenging the court's denial of his request to charge the further lesser included offenses of manslaughter in the second degree and criminally negligent homicide[.]" *People v. Williams*, 273 A.D.2d 824, 710 N.Y.S.2d at 215 (citation omitted). The state court held that "[i]n any event," Williams "was not entitled to the charge because under no reasonable view of the evidence could the jury have found that [he] committed the lesser offense but not the greater[.]" *Id.* (citation omitted).

Although the Supreme Court has held that due process requires a trial court to submit jury instructions regarding lesser-included offenses in capital cases, it "has expressly declined to consider whether such a requirement would apply in the non-capital context." *Jones v. Hoffman*, 86 F.3d 46, 48 (2d Cir. 1996) (citing *Beck v. Alabama*, 447 U.S. 625, 637-38, 638 n. 14 (1980); *Gilmore v. Taylor*, 508 U.S. 333, 361 (1993) (Blackmun, J., dissenting)). In *Jones*, the Second Circuit observed that "a decision interpreting the Constitution to require the submission of instructions on lesser-included offenses in non-capital cases would involve the announcement of a new rule[.]" *Id.* For that reason, the Second Circuit held that *Teague v. Lane*, 489 U.S. 288

(1989),[4] precluded its consideration of the issue. *Id.* (citing *Turner v. Marshall*, 63 F.3d 807, 819 (9th Cir. 1995) ("With the intercircuit split on whether the lack of a lesser included offense instruction in a noncapital case presents constitutional error, any finding of constitutional error would create a new rule, inapplicable to the present case under *Teague*.")). The Second Circuit further held that neither of the two narrowly drawn exceptions to *Teague* applied since the lesser- included-offense rule "does not decriminalize a particular class of conduct, nor does it fall within that small core of 'watershed' rules requiring the observance of certain procedures that are implicit in the concept of ordered liberty." *Id.* (citing *Andrews v. Deland*, 943 F.2d 1162, 1187 (10th Cir. 1991) ("The rule [in *Beck*] is not such a 'watershed' rule as to fit within the second exception."), *cert. denied*, 502 U.S. 1110 (1992)). Thus, the Second Circuit in *Jones* effectively concluded that a claimed error in failing to include a lesser offense instruction in a non-capital case is not a cognizable claim in a habeas corpus proceeding. *Accord*, *e.g.*, *Sullivan v. O'Keefe*, No. 00 CIV. 2292(SAS), 2000 WL 1072304, at *5 (S.D.N.Y. Aug. 2, 2000). Williams's claim therefore is precluded from habeas review.

### c.   Erroneous introduction of evidence of prior identification

Williams contends that the trial court erred in allowing testimony concerning Johnson's prior out-of-court identification of him. However, during his cross-examination of Walker, Johnson's aunt, defense counsel sought to establish that the circumstances surrounding Johnson's viewing of the photographic array were unduly suggestive. T.130-33, 175-78, 194-96, 244-46.  On direct appeal, the state appellate court held that, contrary to defendant's contention,

---

[4] In *Teague*, the Supreme Court adopted the so-called "non-retroactivity doctrine" applicable on habeas review, holding that that "[u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced."

Johnson "was properly permitted to testify with respect to her identification of defendant from a photo array" since Williams "opened the door to the testimony of that witness by eliciting testimony from her aunt concerning that identification and any conversation they may have had with respect to it[.]" *People v. Williams*, 273 A.D.2d 824, 710 N.Y.S.2d at 215 (citing *People v. Bunch*, 58 A.D.2d 608, 395 N.Y.S.2d 231, 232 (App. Div. 2d Dept. 1977) ("[D]efense counsel expressly waived any and all objections to the admission of testimony as to the pretrial photographic identification, and to the photographs themselves, after he opened the door to this subject during cross-examination of the witness[.]")). As Williams cannot establish that the trial court erred as a matter of state evidentiary law, habeas relief is not warranted on this claim.

### d.   Erroneous preclusion of cross-examination regarding witness's familiarity with crime scene

Williams contends that the trial court abused its discretion in refusing to permit defense counsel to question Johnson about whether she was familiar with the neighborhood where the incident took place. He asserts that this "was disaster" for his case because it "left in the minds of the jury that Petitioner would use violence against any one who testified against him[.]" Petitioner's Memorandum of Law at 13 (Docket #2).

During pre-trial discovery, defense counsel had requested addresses of the prosecution witnesses; the prosecutor did not provide them, however, and defense counsel never filed a motion to compel disclosure under New York Criminal Procedure Law § 240.20(1). Apparently, prior to trial, individuals claiming to be associates of Williams made threats of violence against Walker, Johnson's aunt. These allegations were placed on the record by the prosecutor during voir dire, but defense counsel was successful in keeping this information from the jury. When defense counsel attempted to question Johnson as to whether she had lived "right behind" the

address where Williams had been staying at the time of the incident, the prosecutor objected.

The trial court exercised its discretion and sustained the objection. T.206. Given the allegations

regarding the threats of violence, the trial court certainly exercised  appropriate discretion in

keeping the home address of a key witness from being placed on the record. Furthermore,

defense counsel was not prevented from asking Johnson whether she was familiar with the

neighborhood in which the beating took place; that point was established on direct examination.

T.193. Defense counsel was permitted to ask Johnson numerous questions in an effort to suggest,

as Williams had testified, that Johnson actually knew him and several other individuals in the

neighborhood and that she was more familiar with the area than she had stated. T.206-10. There

was no error of state law, let alone any error of federal constitutional magnitude. As such, habeas

relief is not warranted.

## IV.    Conclusion

For the reasons stated above, Jameel Williams's petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because Williams has

failed to make a substantial showing of a denial of a constitutional right, I decline to issue a

certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:      June 20, 2006
            Buffalo, New York.

-32-