UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JAMEEL WILLIAMS,

                        Petitioner,

      -vs-

JAMES CONWAY, Superintendent, Attica
Correctional Facility,

                    Respondent.
_____

**DECISION AND ORDER**
**No. 02-CV-755(VEB)**

## I.      Introduction

This Court denied the petition for a writ of habeas corpus filed by petitioner Jameel Williams ("Williams" or "petitioner") challenging his conviction on one count of second degree murder (N.Y. Penal Law § 125.25(2)) on December 20, 1995, following a jury trial in New York State Supreme Court (Erie County). Represented by counsel, Williams sought a certificate of appealability from the Court of Appeals for the Second Circuit. That court granted a certificate of appealability limited to the issue of whether Williams "received ineffective assistance of counsel because his attorney failed to argue that he was entitled to utilize deadly force to effectuate an arrest pursuant to New York Penal Law § 35.30(4)" and remanded the case "to allow the district court to address [that claim] in the first instance[.]" The Second Circuit denied a certificate of appealability as to Williams' remaining claims.

For the reasons that follow, the Court denies Williams' claim of ineffective assistance of trial counsel premised on the failure to argue the defense of justification under New York Penal Law § 35.30(4).

## II.     Factual Background and Procedural History

The conviction at issue here arose from the beating death of Daryl Bryant ("Bryant") after

he was involved in an altercation with Williams on the streets of Buffalo on January 6, 1995.

Williams fled the scene but there were several eyewitnesses who came forward to the police. On

February 1, 1995, Williams appeared at the Buffalo Police Department with retained counsel

Robert Convissar. He waived his rights and gave a statement which, in relevant part, as follows:

Q:     The Buffalo Police Homicide Bureau is investigating the beating death of
       Daryl Bryant who was found beaten on the corner of Wakefield and
       Holden Sts. on January 6th, 1995 at approximately 7:45 p.m. Can you tell
       me in your own words what you know of this beating?

A:     What actually happened was, I was at a friend of mine's house at 24
       Wakefield. Daryl [Bryant] walks in. He owed me money because he sold
       me a non-working VCR. He was supposed to be paying me back a little,
       little by little. I paid him sixty dollars for the VCR. Daryl told me then that
       he didn't have it. I was on my way out the door and Daryl was talking to
       my friend in the back room. As I was leaving out, Daryl was leaving right
       behind me. We walked the same way up Wakefield. We got to the middle
       of the block and he turned to the side and said, "I shouldn't have to pay
       you nothing." We were still walking, and I told him that he sold me a
       messed up VCR, I should be able to get my money back. By this time we
       were about in front of 58 Wakefield and he turns to the side and grabs me
       by my throat. I tried to jump back to get away from him and he then
       punched me in the face. I fell on top of a car and he snatched by [sic] gold
       necklace and started to run up the street. I got up and chased him. As we
       got to the corner of Wakefield and Holden I saw some friends and I yelled
       to Antoine, "stop him." Daryl stopped to let a carl [sic] go past and he
       tried to continue running but I caught up to him. I grabbed his hand and
       grabbed my necklace out of his hand. He hit me again and that's how the
       fight started.

Q:     What happened now that the fight started?

A:     As we were fighting, he got on top of me. He put his knees on my
       shoulders and started to choke me. I weaved [sic] my arm up and I hit him,
       because he was choking me and I couldn't breathe. When I hit him we fell
       side to side in the snow. I grabbed him by his throat and he still had me by
       my throat. We was [sic] choking each other for at least 2 or 3 minutes. I let
       him go, because I didn't feel no [sic] more force to my neck and he wasn't
       moving. When I seen [sic] that he wasn't moving I turned him over on his

back. I seen that he wasn't breathing and I gave him CPR for about 3 minutes. I am a Red Cross trainee for CPR. I got up and was walking around in a daze.

Q:      What happened after you got up?

A:      I just stared at him and left everything there, my gold chain, the money in my pocket that fell out when we were fighting. I stood there for a while and walked home.

Q:      Who witnessed this fight?

A:      Antoine Parker, he lives at . . . . Martinez Pitts, he lives at  . . . . Derrick Pitts, he also lives at . . . . Alice Cuff, she lives at . . . . [A]nd the rest of the people I never seen [sic].

Q:      Did you punch or kick Daryl more than the once that you stated that you hit him when he was on top of you?

A:      No.

Q:      When you stood up and Daryl was laying [sic] on the ground, did you believe that he was dead at that time?

A:      Yes.

Q:      How did you have hold of his neck?

A:      With two hands like this (deponent places both of his hands around his own throat to show how he had his hands placed).

Q:      Did anyone else participate in this fight between you and Daryl?

A:      No sir.

Q:      The only injuries that Daryl could of [sic] sustained at the time of the fight with you were caused by his altercation with you?

A:      Yes.

Q:      Did you hit Daryl with anything besides the one time that you hit him with your fist?

A:      No.

Q:      What fist did you hit him with and where did the punch land?

A:      I hit him with my right hand and it hit him in the temple.

Q:      When you punched Daryl, did he stop fighting momentarily?

A:      No.

Q:      Did you sustain any injuried [sic] during this fight?

A:      Yes. I had scratches around my neck, bruises on my ribs and arms.

Q:      Did you take anything from Daryl after the fight was over?

A:      No.

Q:      Do you know how to use karate?

A:      No.

Q:      Did you hit Daryl in the neck?

A:      No.

Q:      Why didn't you come forward with information before this time?

A:      Because when it happened, my family was getting harrassed [sic] and my mother told me to get a lawyer.

Q: After this fight ended, you mentioned that you walked home. What address did you walk to?

A: 95 Wakefield. My aunt Karen Garland lives there.

Q: When you went into 95 Wakefield after this fight, did you come back out at any time before the police arrived at the scene of this fight?

A: When I was leaving the scene of the fight, the police were already coming around the corner. I went into 95 Wakefield then I went over to a fiend of mines [sic] house. I went to . . . where my friend Earl lives.

Q: Is there anything else that you can think of that might assist us in this investigation?

A: No sir.

Q: I will now have you read this two page statement out loud, and if it is true and correct will you sign it?

A: Yes.

Q: Now that you have read this statement are there any changes or corrections you wish to make?

A: Only that Antoine Parker lives at . . . .

*See* Record on Appeal at 9-10 (hereinafter cited to as "A.___"), submitted by respondent as part of the state court records; *see also* Trial Transcript at 281-84 (hereinafter cited to as "T.___") (testimony of officer reading statement into record). Williams was allowed to leave the police station on his own recognizance. He was indicted by a Monroe County grand jury several weeks later on charges of second degree (intentional) murder (N.Y. Penal Law § 125.25(2)), and he voluntarily surrendered himself to police at that time. Williams was assigned new counsel (David Silverberg) to represent him at his trial, which was held in December 1995 in New York State Supreme Court (Erie County) (Cosgrove, J.).

**The Prosecution's Eyewitness Evidence**

The prosecution presented the testimony of two eyewitnesses, Dorothy Walker ("Walker") and her niece, Racheal Johnson ("Johnson"). Walker testified that she and Johnson were driving to the supermarket at about 7:45 p.m. when she saw "two people wrastling [sic],

fighting on the street" at the corner of Wakefield and Holden Streets in the City of Buffalo. T.84. Walker stated that one of those individuals was in the courtroom that day, and she identified Williams. T.85. Walker testified that she gave a description to the police at the time of the incident, describing Williams as a black male between 5'8" and 5'10", and 145 to 160 pounds, wearing a red jacket, white shirt, black pants and black "sneaker boots." T.85-86.[1]

According to Walker, when she first saw petitioner and the victim fighting in the street, they were in a "wrastling [sic] position," with petitioner on top. T.91. Walker said that petitioner and the victim were "arguing, fighting," and then "they really hit the ground." *Id.* Petitioner was "punching [Bryant] in the face and then he had his neck a couple times choking him." T.91-92. According to Walker, Williams punched Bryant in the head and face "like a dribble [*sic*]" about five or six times. T.92, 93. Walker saw petitioner "choking the deceased," T.92, and "for a few minutes he was holding him there," *id.* Walker testified that during the fight, she never observed the victim choking petitioner, and never saw either one of them choking each other at the same time. T.103. Walker never saw the victim on top of petitioner. T.103. Nor did she ever observe petitioner performing CPR on the victim. T.103. Walker related that she said to Williams, "Please stop beating on him before you kill him." T.93. In response, Walker testified, petitioner cursed at her, calling her a "bitch" and a "whore." T.94. According to Walker, Williams also said that he "meant to kill [the victim]" because Bryant "owed him ten dollars for some drugs." T.95, 96. Walker heard the victim tell petitioner that he would try to get his money. T.95. Walker also

---

[1]     Walker was permitted to testify that on June 30, 1995, when she accompanied her niece to the *United States v. Wade*, 388 U.S. 218, 228 (1967). hearing, she saw Williams in the hallway of the courthouse and identified him as Bryant's assailant. T.87-88. On cross-examination, Walker admitted that there were police officers escorting him at the time and that that was the first occasion she had ever identified Williams as being involved in the incident. T.136-37.

told petitioner that when she said was going to call the police on him, he told her to "go ahead . . . do what [you] have to do[.]" T.94.

At some point, Walker testified, petitioner stopped punching Bryant and walked across the street to the Wakefield Grocery Store, from which Walker's niece, Racheal Johnson, was exiting. T.97. A few minutes later, petitioner returned to the scene, where the victim was lying prone on the street near the curb. T.99. Walker related that petitioner had his "fists balled up like[,] yo[,]" T.98, and was "moving his arms back and forth" in the air like "somebody that won a battle." T.98. Walker testified that Williams then walked over to the prone victim, adjusted his head and kicked him in the head twice. T.99. Walker said that Williams jumped up and down on the victim's chest and stomach and then "started that – that fist moving thing again." T.99.Walker said she again warned Williams, "[S]top before you kill him[.]" T.101. She also told Williams that she was going to call the police.

Walker related that once she her niece realized that they did not have ten dollars to pay for the victim's ten-dollar debt to petitioner, they went over to a drug store and attempted to call the police but were unable to use the pay phone because someone else was using it. T.101; *see also* T.200.  By the time they returned to the scene, the police had already arrived. T.101-02. Walker testified that during the incident there was a "crowd of young black men" standing on the corner "hollering towards" Williams, but none of them came over. T.102.

Johnson, Walker's niece, testified that as she was driving to the store with her aunt on the night of January 6, 1995, she noticed two black men "wrestling in the street" at the corner of Holden and Wakefield Streets. T.194. Johnson testified that petitioner, who was wearing black pants, black "sneaker boots," a white T-shirt, and a red jacket, was on top of the other man.

-6-

T.197.[2] Williams "straddled" the other man, holding the man's arms down with his knees. T.197. Johnson saw Williams punch the other man with both hands "[a]t least ten to fifteen times," and choke him. T.198.  Johnson stated that the victim was not punching back. T.198. Johnson confirmed that her aunt "told [Williams] to stop because he was going to kill [the victim]." T.198. Johnson testified that Williams responded, "That's what I want to do." T.199. Johnson testified that she never observed the victim choking Williams, and she never saw both men choking each other simultaneously. T.204. Johnson related that she saw Williams took a set of keys and another item out of the victim's pockets. T.199.

When Johnson and her aunt returned to the scene after attempting to call the police, Williams had "come back to the body and was stomping him and kicking him[.]" T.201. The victim was "flat on his back" and Williams "stomped him in the stomach and the face," meaning that he "jumped up and down on his stomach with one foot, and in his face," "quite a few times." T.202. At that point, Johnson and Walker went to another location to try to call the police. T.202. This time, they were successful; when they returned to the scene, the police were already there. Both she and her aunt volunteered themselves as witnesses at the time. T.203.

**The Prosecution's Medical Testimony**

Dr. Baik, the Erie County medical examiner testified regarding the autopsy he conducted of the victim on January 7, 1995. *See* T.326-38.  Based on his findings and experience, he opined that, to a reasonable degree of medical certainty, the victim's cause of death was "blunt force injury to the head and neck area." T.338. Dr. Baik found a "triangular shaped abrasion" on the right side of the victim's face which appeared to have been "inflicted with [a] sharp end of a

---

[2]     Johnson identified Williams from a photographic array prior to trial.

shoe," T.328, although he could not say for certain what caused that abrasion.  He found

numerous bruises on the victim's head and face and external trauma to the victim's neck. T.328-

29. On the right side of the neck there was a linear abrasion, and both sides of the neck were

slightly swollen. T.330. Three of the victim's teeth were broken and one tooth was missing.

T.329.  Dr. Baik found evidence of hemorrhaging to the front of victim's skull, as well as the

right side of the temple. T.331. A small amount of subarachnoid hemorrhage–bleeding outside of

the brain under the membrane. T.331. In addition, the cerebellum demonstrated a "prominent

pressure cone," T.331-32, which meant that after the victim sustained the initial head injury, "he

was beaten so many times [that] the brain . . . was swollen [and] . . . the intracranial space [wa]s

limited." Because there was no extra space to accommodate the swelling of the brain, it

"mov[ed] to the central part of the brain," causing "brain stem herniation." T.332. The medical

examiner did not find any injuries or other trauma to the victim's hands and knuckles. T.332.

Dr. Baik testified that, to a reasonable degree of medical certainty, Bryant died of blunt

force trauma to the head and neck area, which could have been caused by a blunt object or a fist

or by kicking. T.338. Although there was evidence that the victim had been choked for a period

of time, the cause of death was *not* strangulation. T.339; *see also* T.349. The medical records

indicated that the doctors had inserted a chest tube while Bryant was being treated at the

emergency room, so he was alive for a short period of time after the beating. T.339.

The toxicology reports indicated that the victim had used an unknown amount of cocaine

prior to his death. T.340. A crack pipe was found in one of the victim's pockets. On cross-

examination, the medical examiner agreed that the victim had been a drug abuser. T.348.  He,

testified however, that the victim's cocaine use did not cause swelling of the brain and stated that

the victim's cocaine use did not contribute to the cause of death. T.348-49.

**The Defense Case**

Eighteen years-old at the time of the incident, Williams testified that prior to the altercation with Bryant, he had never been convicted of a crime. Before the instant trial commenced, however, he pled guilty to the attempted unauthorized use of a motor vehicle, a misdemeanor. T.461. Williams recounted in his testimony the events of the night of January 6, 1995, consistently with his statement to the police given in the presence of counsel. *See* T.472-90.

Williams testified that he and the victim had argued about the fact that Bryant had sold him a "messed up VCR" and would not refund his money. T.473. Bryant said, "You all think because I get down [sic] that you all can just run over me." *Id.* Williams said, "Man, just listen to me. You sold me a messed up VCR, that's all I'm saying." T.473. Then Bryant "walked up, snatched [his] necklace and . . . whacked [him]" " right in the eye[.]" T.473-74. Williams explained, "[Bryant] [p]unched me right in my eye, hit me directly in my eye, okay. I tried to jump back, I hit the car. And, he reached over and I had – the sweatshirt I had on was drooping in the front and he snatched my herringbone necklace off my neck." T.474. Williams then described his necklace and what clothes he was wearing that night–Miami Dolphins jacket, teal green pants, and brown boots that night. T.474.

Defense counsel then questioned Williams about what happened immediately after Bryant punched him and snatched his necklace:

> A:      At first I didn't know he snatched it until I touched my neck. And, he
>         started running, so I started running after him because I figure by now I
>         notice my necklace was gone. So, he got near the corner, I seen [sic] a

couple of my friends. I said, "Grab him." And, they was [sic] looking at me like they don't know who I was talking about. So as he tried to cross the street, a car slid in front of him so he stopped. And, I caught up to him, I grabbed his hand, I snatched my necklace out of his hand. He turned around and whacked me again.

Q:  By whacked you, he punched you again?
A:  That's how the fight started.
Q:  So you and Daryl Bryant got into a fight?
A:  Yeah.
Q:  Now, at that point in time did you throw any punches?
A:  No, I couldn't. I was trying to duck my head down because he hit me kind of hard, blurred my vision.
Q:  And what happened next?
A:  Well, I grabbed him, we locked up. He started kneeing me, we fell to the ground. And, I wasn't that much stronger than he was, so he got on top of me, he started choking me and I couldn't breathe, you know, just like the last minute a burst of energy, I just slid my under and hit him, as I hit him I grabbed him.

T.475-76. Williams testified that he hit Bryant with his right hand in his temple, and then

"grabbed him around his neck like this and [they] was [sic] that close, together on the ground."

T.476. Bryant's "body just shifted" and Williams claimed that he "had enough strength to grab

him, slam him to the ground on the side of [Williams]." T.476. Williams testified, "We was [sic]

rolling around in a circle back and forth, back and forth trying to get on top of each other." T.476.

Williams described the fight as follows:

Q:  As you were fighting did [Bryant] continue to hold onto you?
A:  Oh, yeah, it was – it was like he wasn't going to let go and I was – the way I was thinking was he was going to really hurt me, because the way he had my neck, I couldn't breathe. Also, when I was trying to make – put enough pressure so he would let go, to try to get his hands off from my neck.
Q:  If you didn't apply the pressure what did you think would have happened to you?
A:  Me, I think he would have killed me, honestly, because he had me right here by my throat, sticking his nails in my throat, his thumb nail.

T.477. Williams testified that Bryant had both hands wrapped around the front of his neck,

defense counsel questioned him about how he "eventually manage[d] to get him to release his grip":

> A:  When I felt the pressure slowing sliding off of my neck, I let him go. And it was like he just drooped, he was just laying there drooped over. And from that point I knew something was wrong. I was like if you – if you had a fight before, the person's not just going to let you go if they swung at you and fought you all this time. It had to be something wrong. So when I looked down at him it just – he was – his eyes didn't move, just staring up at me. And, I was like something had to be wrong, the only thing I could do was I turned him on his back, I put my hands under his head, I opened his mouth, I put my mouth on his mouth and I breathed in his mouth four times, and I pressed on – down on his chest ten. And, I waited to see if I hear him take a breath of anything. I did this constantly . . . . And, he just didn't move. And, I just panicked. . . . I never been [sic] around something like that, you understand what I'm saying to you ? Just shocked me.

T.478. Williams testified that he had received CPR training when he was working as a lifeguard in a summer youth program several years ago. T.466. Williams testified that he did not intend to kill Bryant, nor did he intend to seriously injure him. T.479.  When asked whether he received any injuries during the altercation, Williams testified that he "had bruises on [his] neck, [his] eye was swollen like three or four days," and he "had deep scratches on [his] back." T.488.

Williams denied kicking or stomping on the victim, or doing a "victory dance" at the Wakefield Deli. T.479-80. Williams testified that after he left Bryant, he walked over to his aunt's house and asked his cousin, , to go outside and see what was going on. T.479. Williams then "left because [he] didn't want to stay around . . . [he] didn't know what to do." T.479. Defense counsel asked Williams why he had not gone back out to the scene and talk to the police when they arrived:

> A:  First of all I didn't know what to do, first thing that came to my mind was they going to arrest you [sic] and just, I don't know, I just – I couldn't really say, I honestly don't know. I was just paranoid, I didn't know what

to do.

T.481-82. Williams then explained that he later heard that the police wanted to question him and

that he retained a lawyer, went to the Buffalo Police Department to turn himself in, and that he

was allowed to leave after giving his statement to the police. When he gave his statement to the

police, he indicated that when he walked away he left money there that had fallen out of his

pocket. He testified on direct examination that he "didn't bother to turn around and look [for his

gold necklace] because all those peoples [sic] that was out there, [he] figured it would be gone

anyway, so it wasn't going to be no [sic] use of me trying to get it back. T.484. Williams told the

police that he had seen his acquaintances Martinez Pitts at the scene but he was unaware if the

district attorney's office had contacted any of those witnesses. Williams testified that he told the

police that he did not punch the victim more than once, and that occurred when the victim was on

top of Williams. T.486, 487. He told the police that when he stood up, and the victim was lying

on the ground, he believed that the victim was dead at that point but he did not know that for a

fact. T.486-87.

Williams testified that he knew Bryant from the neighborhood, where he saw Bryant

"bully a couple people around" and "get in fights with a couple store owners." T.468; *see also*

T.524 ("Q: One reason that you fought so hard was also Mr. Bryant's violent reputation, is that

correct? A: Yes, I seen [sic] him put a pretty good whipping on a couple people around the

neighborhood."). Williams also claimed that he saw Bryant steal from a store in the

neighborhood. According to Williams, Bryant's drug use was "just a big joke to him" since he

routinely would get high out in public. *Id.*  Williams denied that he owned a red jacket or black

sneaker boots, which was the clothing description given by eyewitnesses Walker and Johnson.

-12-

T.464. Williams testified that he did not see any other males in the vicinity of Wakefield and

Holden Streets who were wearing a red jacket at the time of the incident. T.489.

At the end of his direct testimony, Williams, in response to the question, "Who threw the

first punch?" testified that Bryant did. Williams said, "The first punch was thrown back down

the street." T.489. Defense counsel concluded by questioning Williams as follows:

> Q:    Now, at the time that you chased him, you were not in fear for your person
>       at that point in time, were you?
> A:    No, I just wanted to get my necklace back.
> Q:    And when you were trying to get your necklace back did you intend to use
>       deadly force on him?
> A:    No.
> Q:    Did you intend to seriously injury him?
> A:    No.

T.489.

Alice Kirk ("Kirk") testified for the defense that her next-door neighbor was Sharon

Garland ("Garland"), Williams' aunt. T.374. Williams used to live at Garland's house; Kirk

knew him as "one of the neighborhood children." Kirk stated that on the evening of the incident,

two people ran past her house. T.375. When she looked down the street, she could see them

standing on the corner and they appeared to be "children wrassling [sic] . . . playing around in the

snow." T.375, 388. Kirk later learned that something more serious was going on when her niece,

Erica Brown ("Brown"), came in the house and told her "to call the rescue squad, they can't get

the little boy [sic] to wake up." T.376. Kirk then looked out her window and saw one of the

individuals administering CPR to the other person; she was not able to identify them but she

could "clearly see what they were doing." *Id.* Kirk averred that the person doing CPR was not

emergency medical personnel since it was before the ambulance arrived. T.377.

On cross-examination, the prosecutor asked Kirk whether it was true that she never said anything to him or to the police about witnessing one of the individuals performing CPR. T.392-93. Kirk stated she did not recall. T.393. After argument out of the presence of the jury and over defense counsel's strenuous hearsay objection, the trial court allowed the prosecutor to introduce the tape of Kirk's 911 call to refresh her recollection as to whether she said to the operator, "Are they still beating him?" in response to Brown's observation that one of the individuals on the corner was being beaten. *See* T.393-406. Kirk testified that she never personally observed anyone beating anyone else at the corner of Wakefield and Holden that night. T.409. Kirk admitted that she had a criminal record, including convictions for petit larceny, disorderly conduct, and obtaining public assistance by fraud. T.407-09.

Valerie Patterson ("Patterson") testified for the defense that Williams was her cousin and that he stayed "off and on" at Garland's house. T.410-11. Patterson testified that she also was living with her son at Garland's house. T.411. Patterson testified that Williams had received a teal green and orange Miami Dolphins jacket for Christmas that year and that after he received it, she never observed him wearing any other colored jackets. T.413. Patterson stated that, sometime between 7 p.m. and 9 p.m., Williams came into the house and took her into the kitchen. He was wearing his Miami Dolphins jacket. T.414. Patterson said that he was "nervous" and "sweating" and "crying," and he appeared to have scratches around his chin area and his neck. T.414, 421. Williams said that he had "been in a fight and he didn't really know what was going on, but he wanted [her] to go outside and check to see if everything was all right." T.416. Williams told her that he tried to help the person with whom he was fighting get up by administering CPR, but "the guy didn't get up." T.417. On cross-examination, Patterson admitted that Williams did not say

anything about choking or strangling. T.421. Patterson denied that she told defense counsel that

an individual named Antoine Parker gave somebody CPR that night. T.422.

Verniata Britt ("Britt"), Williams's mother, testified for the defense that Williams lived

with her sister, Sharon Garland. Britt stated that she had bought Williams a Miami Dolphins

jacket for Christmas and that she knew that he did not own a red jacket. When she saw Williams

on the day after the incident, he was wearing the Miami Dolphins jacket. He told her that he had

"gotten in a fight with someone" and that "something bad happened." T.437. He did not say that

he had killed someone. *Id.* Britt admitted that she had been convicted of attempted petit larceny

for the misuse of food stamps. She admitted that she lied on her application for welfare benefits

by not disclosing that she was employed and had pled guilty to third degree grand larceny

regarding this welfare fraud. T.442-43.

Garland, Williams's aunt, testified for the defense that Williams was her nephew and that

he stayed at her house frequently. T.447. She testified that she never observed Williams wearing

a red jacket and that he did not have one at her house. T.448.

The following counts were submitted to the jury for its consideration: second degree

(intentional) murder, as charged in the indictment, and first degree manslaughter as a lesser

included offense of second degree murder. The trial court charged the jury on the general defense

of justification under P.L. § 35.15. The jury returned a verdict convicting Williams of second

degree (intentional) murder. He was sentenced to an indeterminate term of incarceration of

seventeen and one-half years to life.

Williams retained new counsel, Salvatore Abbate and James Ostrowski, to represent him

after trial and brought a motion to vacate the verdict pursuant to New York Criminal Procedure

Law ("C.P.L.") § 330.30 arguing, *inter alia*, that trial counsel was ineffective because he had

failed to argue that Williams actions were justified under New York Penal Law ("P.L.") §

35.30(4), which permits a private individual to use deadly physical force, in certain

circumstances, for the purpose of effecting a "citizen's arrest." *See* N.Y. Penal Law §

35.30(4)(a), (b).  The C.P.L. § 330.30 motion was denied by the trial court on the merits in a

written decision and order. On direct appeal, Williams' new attorneys raised essentially the same

claims raised in the C.P.L. § 330.30 motion, including that trial counsel was ineffective in failing

to "argue that the Defendant's actions were justified by Penal Law Section 35.30(4)[(b)][.]"

Petitioner's Appellate Brief ("Pet'r App. Br.") at 8 (quoting N.Y. Penal Law § 35.30(4)(b)),

attached part of Exhibit B to Respondent's Exhibits ("Resp't Ex.") submitted in connection with

its Answer to the Petition; *see also id.* at 8-10, Resp't Ex. B. In rejecting Williams' claim that

trial counsel provided ineffective assistance, the Appellate Division, Fourth Department, held as

follows:

> We reject the contention that defendant was denied effective assistance of
> counsel. Supreme Court properly denied defendant's motion pursuant to CPL
> 330.30 to set aside the verdict on that ground, determining that, while "not
> perfect, [defense counsel's] cross-examination of witnesses, opening and closing
> statements and argument of legal issues at pre-trial hearings and at trial were all
> conducted in a thorough, professional and effective manner." Furthermore, it is
> not for an appellate court "to second-guess whether a course chosen by
> defendant's counsel was the best trial strategy so long as defendant was afforded
> meaningful representation" (*People v. Satterfield*, 66 N.Y.2d 796, 799-800, 497
> N.Y.S.2d 903, 488 N.E.2d 834). Defendant's contention that defense counsel
> should have presented expert testimony concerning the effects of cocaine use by
> the victim in order to provide exculpatory or mitigating evidence concerns matters
> outside the record and is therefore properly addressed in a CPL 440.10 motion
> (*see*, *People v. Snitzel*, 270 A.D.2d 836, 705 N.Y.S.2d 541; *People v. Chiera*, 255
> A.D.2d 685, 686, 681 N.Y.S.2d 111). Defendant's further contention that defense
> counsel should have called certain witnesses to testify is also properly the subject
> of a CPL 440.10 motion (*see*, *People v. Snitzel*, *supra*). Although we agree with

>defendant that one prosecution witness was difficult and made certain prejudicial
>remarks, we reject his contention that defense counsel's actions with respect to
>that witness deprived him of meaningful representation (*see generally*, *People v.
>Baldi*, 54 N.Y.2d 137, 147, 444 N.Y.S.2d 893, 429 N.E.2d 400). Although
>defense counsel's representation was not error free, we conclude that defense
>counsel's conduct, viewed either with respect to specific alleged errors or as a
>whole, did not "rise to the level of 'egregious and prejudicial' conduct necessary
>to prevail on an ineffective assistance of counsel claim" (*People v. Flores*, 84
>N.Y.2d 184, 187-188, 615 N.Y.S.2d 662, 639 N.E.2d 19; *see*, *People v.
>Benevento*, 91 N.Y.2d 708, 713, 674 N.Y.S.2d 629, 697 N.E.2d 584).

*People v. Williams*, 273 A.D.2d at 824-25. Leave to appeal to the New York Court of Appeals

was denied.

Williams, represented by new retained counsel, Roger Wilcox, now argues that trial

counsel's failure to pursue the defense of justification set forth in P.L. § 35.30(4), the "citizen's

arrest" provision, was constitutionally inadequate under *Strickland v. Washington* and warrants

the grant of habeas relief. *See*, *e.g.*, Pet'r Mem. at 14 (Dkt. #38). Respondent contends that trial

counsel made a reasoned strategic decision not to pursue that defense and that, even if the jury

had been instructed on New York Penal Law ("P.L.") § 35.30(4), there is no reasonable

probability that it would have reached a different verdict in Williams' case. *See*, *e.g.*, Resp't

Mem. at 9-10 (Dkt. #39-1).

## III.    Discussion

### A.    AEDPA Standard of Review

The filing of Williams' petition post-dates the April 24, 1996 enactment of the Anti-

terrorism and Effective Death Penalty Act ("AEDPA") and therefore is governed by that statute's

amendments to 28 U.S.C. § 2254.  AEDPA has "significantly curtailed the power  of federal

courts to grant the habeas petitions of state prisoners." *Lainfiesta v. Artuz*, 253 F.3d 151, 155 (2d

Cir. 2001) (citing *Williams v. Taylor*, 529 U.S. at 399). When a state court has adjudicated a

habeas petitioner's claims on the merits, habeas relief may not be granted unless the state court's

holding was contrary to, or was an unreasonable application of, clearly established Federal law,

as determined by the United States Supreme Court; or was based on unreasonable determination

of the facts in light of the evidence presented in petitioner's state court proceeding. *See* 28 U.S.C.

§ 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *accord*, *e.g.*, *Hemstreet v.

Greiner*, 02-2747-pr, __ F.3d __, 2007 WL 2002733 (2d Cir. June 20, 2007); *Greiner v. Wells*,

417 F.3d 305 (2d Cir. 2005).

The Appellate Division's rejection of Williams' claim of ineffective assistance of trial

counsel, *see People v. Williams*, 273 A.D.2d at 824-25, represents an adjudication on the merits

for purposes of 28 U.S.C. § 2254(d). *See Hemstreet v. Greiner*, 2007 WL 2002733, at *4 ("The

Appellate Division's rejection of Hemstreet's *coram nobis* petition on the grounds that Hemstreet

had 'failed to establish that he was denied the effective assistance of appellate counsel[ ]' . . .

represents an adjudication on the merits for purposes of [AEDPA].") (citing *Mosby v. Senkowski*,

470 F.3d 515, 519 (2d Cir. 2006); *Jimenez v. Walker*, 458 F.3d 130, 141 (2d Cir. 2006) (internal

citation omitted)); *see also Mosby v. Senkowski*, 470 F.3d at 519 ("Although the Appellate

Division's summary rejection of Mosby's *coram nobis* petition did not mention Mosby's federal

claim, it nonetheless constituted an adjudication on the merits.") (citing *Sellan v. Kuhlman*, 261

F.2d 303, 309, 312 (2d Cir. 2001)). This Court "must apply AEDPA's 'highly deferential

standard' in reviewing [Williams'] ineffective assistance of counsel claim." *Mosby*, 470 F.3d at

519 (quoting *Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir. 2003)) (acknowledging that "the

heavy burden of showing ineffective assistance" is "enhanced by the hurdle posed by the highly

deferential review accorded state court adjudications under [AEDPA]" (citations omitted)).

Williams' ineffective assistance of trial counsel claim "'necessarily invokes federal law that has been "clearly established" by the Supreme Court within the meaning of AEDPA[,]'" *Id.* (quoting *Sellan v. Kuhlman*, 261 F.2d at 309), namely, the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), *id.*  *Strickland* requires a defendant demonstrate both (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense. 466 U.S. at 687. The "performance" component necessitates a showing that the defendant's attorney "made errors so serious that [he or she] was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* Demonstrating "prejudice" requires the defendant show that "but for counsel's unprofessional errors," there is "a reasonable probability" the "result of the proceeding would have been different." *Id.* at 694. Under the *Strickland*  test, a court need not address its two prongs in any particular order since a finding that a defendant or petitioner has failed to satisfy one prong obviates the need to consider the other prong. 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim to approach the inquiry in [a particular] order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."); *accord*, *e.g.*, *Strouse v. Leonardo*, 928 F.2d 548, 556 (2d Cir. 1991) (holding that the court need not address alleged deficiencies in counsel's performance where defendant failed to establish sufficient prejudice).

"Where . . . the state court's application of governing federal law is challenged, it must be shown to be not only erroneous, but objectively unreasonable." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (*per curiam*); *see also Williams v. Taylor*, 529 U.S. at 409; *accord Hemstreet*, 2007 WL 2002733, at *5. Thus, to demonstrate that his claim of ineffective assistance of counsel

entitlements him habeas relief under AEDPA's deferential standard, Williams must establish

"that the Appellate Division's application of *Strickland* was not merely incorrect, but

'"objectively unreasonable."'" *Hemstreet*, 2007 WL 2002733, at *5 (quoting *Loliscio v. Goord*,

263 F.3d 178, 184 (2d Cir. 2001) (in turn quoting *Williams*, 529 U.S. at 409)). In order to grant

the writ under AEDPA, there must be "some increment of incorrectness beyond error," although

"the increment need not be great; otherwise, habeas relief would be limited to state court

decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d

100, 111 (2d Cir. 2000) (internal quotation marks omitted).

### B.    Merits of Petitioner's Claim of Ineffective Assistance of Trial Counsel

As noted above, *Strickland v. Washington* sets forth the familiar two-pronged test for

determining whether a defendant's Sixth Amendment right to the effective assistance of counsel

has been violated: The defendant must show both that "that counsel's representation fell below

an objective standard of reasonableness . . . under prevailing professional norms," 466 U.S. at

688, and "that the deficient performance prejudiced the defense[.]" *id.* at 687; *accord, e.g.*,

*Hemstreet*, 2007 WL 2002733, at *4; *Henry v. Poole*, 409 F.3d 48, 62-63 (2d Cir. 2005). To

fulfill the "prejudice" requirement, a defendant"must show that there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." 466 U.S. at 694. Stated another way, prejudice ensues when "counsel's errors were so

serious as to deprive the defendant of a fair trial, a trial whose result is reliable," *id.* at 687;

*accord, e.g.*, *Henry v. Poole*, 409 F.3d at 62.

### 1.    Reasonableness of Trial Counsel's Conduct

When evaluating the quality of trial counsel's representation–that is, whether counsel's

performance fell below an objective standard of reasonableness–the reviewing court must keep in mind both that counsel "has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process," *Strickland*, 466 U.S. at 688, and that counsel must have "wide latitude" in making tactical decisions, *id.* at 689. The Supreme Court has instructed that "every effort [must be made] . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time[.]" 466 U.S. at 689.  Actions or omissions by counsel that " 'might be considered sound trial strategy'" do not constitute ineffective assistance. *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Id.* at 690.  Even decisions as to strategy made after a less-than-complete inquiry do not amount to ineffective assistance, provided that it was reasonable for counsel to believe that, based on the facts as known to him or her at the time, further investigation was unnecessary, *id.* at 690-91. *Accord*, *e.g.*, *Henry v. Poole*, 409 F.3d at 63. The Supreme Court's clearly established precedent, as set forth in *Strickland v. Washington*, thus requires a court reviewing an ineffective assistance claim to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." 466 U.S. at 689.  Stated another way, the reviewing court always begins with the presumption that counsel was effective.  *Strickland*, 466 U.S. at 690); *see also id.* at 691 ("In assessing performance, we must apply a "heavy measure of deference to counsel's judgments.") (quotation omitted).

Normally, trial counsel will not be faulted "for foregoing a potentially fruitful course of conduct if that choice also entails a 'significant potential downside.'" *Greiner v. Wells*, 417 F.3d

305, 319 (2d Cir. 2005) (quoting *Sacco v. Cooksey*, 214 F.3d 270, 275 (2d Cir. 2000) and citing

*Bell v. Cone*, 535 U.S. 685, 701-02  (2002) (holding that state court determination that counsel

for capital murder defendant did not provide ineffective assistance during sentencing phase when

he chose not to call defendant as a witness, or to recall as witnesses medical experts who had

testified during guilt phase and defendant's mother, and to waive final argument, did not involve

an unreasonable application of *Strickland* standard given the choices available to defense counsel

at the time and the strength of the state's case against defendant, and thus could not support grant

of federal habeas corpus relief under AEDPA)). Thus, "[a] lawyer's decision not to pursue a

defense does not constitute deficient performance if, as is typically the case, the lawyer has a

reasonable justification for the decision." *DeLuca v. Lord*, 77 F.3d 578, 588 n. 3 (2d Cir.1996).

The Supreme Court has held that "strategic choices made after thorough investigation of law and

facts relevant to plausible options are virtually unchallengeable," *Strickland*, 466 U.S. at 690-91.

Moreover, "strategic choices made after less than complete investigation are reasonable precisely

to the extent that reasonable professional judgments support the limitations on investigation." *Id.*

Williams argues that trial counsel mistakenly pursued only the general defense of

justification under  P.L. § 35.15(2), New York's "self-defense" provision. Petitioner contends

that trial counsel should have pursued alternative defenses under both subsections of P.L. §

35.30(4), which allows an individual making a "citizen's arrest" to use deadly physical force in

certain circumstances. Pet'r Mem. at 11 (Dkt. #38). Petitioner asserts that the defenses under P.L.

§ 35.30(4) "were clearly available *and* viable on the evidence adduced at trial." Pet'r Mem. at 6

(Dkt. #38) (emphasis in original). Penal Law § 35.30(4) provides as follows:

A private person acting on his or her own account may use physical force, other

than deadly physical force, upon another person when and to the extent that he or she reasonably believes such to be necessary *to effect an arrest or to prevent the escape from custody of a person whom he or she reasonably believes to have committed an offense and who in fact has committed such offense*; and *may use deadly physical force for such purpose when he or she reasonably believes such to be necessary to*:

(a) [d]efend himself, herself or a third person from what he or she *reasonably believes to be the use or imminent use of deadly physical force*;

*or*

(b) *[e]ffect the arrest* of a person who has committed murder, manslaughter in the first degree, robbery, forcible rape or forcible criminal sexual act and who is in immediate flight therefrom.

N.Y. Penal Law § 35.30(4)(a), (b) (emphases supplied).  Petitioner contends that "his uncontroverted testimony that [the victim] grabbed him by the throat, punched him in the eye, ripped [his] gold chain off his neck, and then fled[,] an explanation [petitioner] gave to police long before trial[,] " Pet'r Mem. at 10 (Dkt. #38), entitled him to a jury instruction under P.L. § 35.30(4). Petitioner does not specify whether he is referring here to subsection (a) or (b). In addition, Williams claims entitlement to the "Penal Law § 35.30(4)(a) defense" based on his testimony that "when [he] chased Bryant down to recover the gold chain [Bryant] had robbed, Bryant began punching, kneeing, and choking [him]." Pet'r Mem. at 10 (Dkt. #38).

After reviewing the record in Williams' criminal proceeding, the Court cannot find that it was professionally unreasonable for trial counsel to have declined to pursue a defense under P.L. § 35.30(4). First, Williams' pre-trial statement, which is set forth above in this Decision and Order, read in conjunction with other information available to defense counsel prior to trial, did not strongly support the elements required under P.L. § 35.30(4), as discussed below.

The Court agrees that, if one reads the first paragraph of Williams' pre-trial written

statement to the police in isolation, one might infer that Williams initially *chased* the victim in

order to "effect an arrest[,]" N.Y. Penal Law § 35.30(4): Williams stated that he began pursuing

the victim when he allegedly realized that the victim "snatched [his] gold necklace" and that he

called out to some friends to "stop him." *See* Petitioner's Written Statement to Police, A.9.

However, petitioner's application of "deadly physical force" did not occur until *after* he caught

up with the victim and retrieved the necklace from him. *See id.* As respondent notes, Williams

related to the police, and testified at trial, that he had gotten his necklace back *before* the "fight"

started. *See* Resp't Mem. at 7 ( Dkt. #39-1). Petitioner's written statement, read in its entirety,

conveys the distinct impression that the alleged robbery of the necklace and the fight on the street

corner were two separate events, at least in petitioner's view: Williams stated that when caught

up to Bryant and grabbed the necklace, the victim "hit [him] again[,]" and "[T]hat's how the

fight started." A.9. Indeed, Williams made the following oral statement to the police at the time

he turned himself in with his attorney and was told that he was being charged with murder:  "It

ain't [sic] nothing but a fight. I ain't [sic] worried about it." A.53; *see also* A.12. Furthermore,

petitioner's "associate," Martinez Pitts ("Pitts"), whom Williams listed as a witness to the

incident in his written statement, *see* A.9, described the incident to the grand jury as "[j]ust [a]

regular fight. They [*i.e.*, petitioner and the victim] was [sic] fighting." A.71.

In addition, the manner in which Williams told the police that he behaved after the fight

was over, *see* A.9, tends to undermine a finding that his use of deadly physical force was for the

purpose of effecting the arrest of a person who supposedly had just robbed him. When asked

"[w]hat happened after [he] got up" from administering CPR to the victim, *see* A.9, Williams'

response was that he "stared" at the victim, and "left everything there," including "[his] gold

chain," and he then "walked home." *See* A.9. As respondent points out, *see* Resp't Mem. at 7
(Dkt. #39-1), petitioner now claims that he was justified in using deadly physical force against
the person who had just robbed him of his gold necklace–but he did not bother to retrieve the
necklace before he left the scene. *See* A.9.   Nor did petitioner wait for the police or emergency
personnel to arrive to inform them that a robbery had occurred. *See* A.9; *see also* Resp't Mem. at
7 (Dkt. #39-1). In fact, Williams told the police said that he could see police cars coming around
the corner–yet he continued walking away from the scene.

Petitioner now argues that "[w]here the necklace ended up after the robber fled with it is
of no import when determining whether the Penal Law § 35.30(4)(a) and (b) justification
defenses apply." Pet'r Reply Mem. at 6 (Dkt. #42). In this Court's opinion, a factor supporting
the reasonableness of trial counsel's decision to forego the "citizen's arrest" defense under P.L. §
35.30(4) is the lack of corroborating proof that a robbery had been committed. Penal Law §
35.30(4) requires that a defendant seeking to justify his use of deadly physical force for effecting
an arrest "reasonably believe[]" that an offense has been committed by the person against whom
the force is exercised. N.Y. Penal Law § 35.30(4). Although petitioner is correct that a defendant
does not bear the burden of proving beyond a reasonable doubt the elements of an ordinary
defense such as P.L. § 35.30(4), that statute clearly also requires that the person against whom
the citizen is using deadly force "*in fact* has committed such offense." N.Y. Penal Law § 35.30(4)
(emphasis supplied); *see also People v. Pena*, 169 Misc. 2d 75, 84 (N.Y. Sup. Ct. 1996)
("Plainly, therefore, the requirement that the actor be seeking to arrest a person who *in fact*
committed the requisite felony is a predicate to the use of the force . . . ."); *People v. Karp*, 158
A.D.2d 378, 391 (App. Div. 4th Dept.) (dissenting opn.) (Under P.L. § 35.30(4), the "use of

deadly physical force is justifiable only if a robbery *had in fact* been committed[.]") (citation omitted), *rev'd for reasons stated in dissenting opn.*, 76 N.Y.2d 1006 (N.Y. 1990); *People v. Borrero*, 118 A.D.2d 345, 350 (App. Div. 1st Dept. 1986) ("Since it is evident that Johnson had committed an offense in his presence, defendant was entitled . . . to follow Johnson out of the drugstore and make a citizen's arrest. Certainly, the evidence is more than adequate to satisfy the mandates of Penal Law 35.30(4)[.]").

Here, Williams, a decidedly interested witness, provided the only proof that Bryant actually committed a robbery. As noted above, petitioner never reported the robbery of his necklace and claimed in his pre-trial statement to the police that he left the necklace at the scene. *See* A.9. At trial, he claimed that he did not even look for the necklace. The necklace was never recovered, and there were no witnesses corroborating the alleged robbery. Even if Williams' testimony alone were enough evidence adduced for the trial court to have issued a jury instruction on the "citizen's arrest" defense,[3] the relative lack of such proof would have been another concern counseling against asserting a defense under P.L. § 35.30(4).  Petitioner's actions after the incident–leaving the necklace at the scene and not informing the police that there

---

[3]       Under New York state law, when determining whether a defendant is entitled to a jury instruction on a defense, the trial court must view the evidence in the light most favorable to the accused. *People v. Watts*, 57 N.Y.2d 299, 301 (N.Y. 1982) ("A court is required to instruct the jury on "fundamental legal principles applicable to criminal cases in general" and those "material legal principles applicable to the particular case[,]" [*see* [N.Y. Crim. Proc. Law §] 300.10(1), (2)).  When evidence at trial viewed in the light most favorable to the accused sufficiently supports a claimed defense, the court should instruct the jury as to the defense, and must when so requested.  As a corollary, when no reasonable view of the evidence would support a finding of the tendered defense, the trial court is under no obligation to submit the question to the jury. So viewing the evidence, the trial court then must ascertain whether there is a "valid line of reasoning and permissible inferences," *People v. De Normand*, 1 A.D.3d 1047, 1048 (App. Div. 4th Dept. 2003), from which a jury could "rationally conclude," *People v. Reynoso*, 3 N.Y.2d 816, 818 (N.Y. 1988) (citing *People v. Collice*, 41 N.Y.2d 906, 907 (N.Y. 1977); *People v. Goetz*, 68 N.Y.2d 96 (N.Y. 1986)), *habeas corpus denied sub nom. Reynoso v. Leonardo*, 735 F. Supp. 134 (S.D.N.Y.), *aff'd*, 916 F.2d 709 (2d Cir. 1990), that Williams "reasonably believed" that deadly force was "necessary" to effect the arrest of the victim. N.Y. Penal Law § 35.30(4).

had been a robbery–were at least facially inconsistent with his claim that the incident arose from

his attempt to effect a citizen's arrest of the person who purportedly had just robbed him. That

factor would have been an important consideration in determining which defenses, as a strategic

matter, to pursue at trial. Moreover, in making that decision, trial counsel necessarily would have

had taken into account the relative persuasiveness of a particular defense given his client's sworn

statement to the police and the other evidence available.

   Petitioner's written statement to the police may have supported a finding that he *chased*

the victim for the purpose of "effect[ing] an arrest or . . . prevent[ing] the escape from custody of

a person whom he or she reasonably believes to have committed an offense and who in fact has

committed such offense[.]" N.Y. Penal Law § 35.30(4). However, both P.L. § 35.30(4)(a) and

P.L. § 35.30(4)(b) contemplate that application of "deadly physical force" be for the purpose of

effecting the arrest. Section 35.30(4)(a) allows a defendant to use "deadly physical force for such

purpose [*i.e.*, effecting an arrest]," N.Y. Penal Law § 35.30(4), when the defendant "reasonably

believes such to be necessary" to "[d]efend himself . . .  from what he . . . reasonably believes to

be the use or imminent use of deadly physical force[,]" N.Y. Penal Law § 35.30(4)(a). Penal Law

§ 35.30(4)(b) similarly provides that a defendant may use "deadly physical force for such purpose

[*i.e.*, effecting an arrest]," N.Y. Penal Law § 35.30(4), when he "reasonably believes such to be

necessary," *id.*, to "[e]ffect the arrest of a person who has committed . . . robbery . . . and who is

immediate flight therefrom[,]" N.Y. Penal Law § 35.30(4)(b). In this Court's opinion,

petitioner's written statement only by inference led to the conclusion that petitioner used "deadly

physical force" against the victim "for [the] purpose" of "effect[ing] the arrest" of the victim.

Petitioner's oral statement to the police about the incident with Bryant being "just a fight" and

the statements of Pitts, a witness to the incident, further undermined a finding that Williams was interested in "effecting an arrest" when he used "deadly physical force" against Bryant. *See also* Resp't Mem. at 7 (Dkt. #39-1).

Williams asserts that "[s]trategy cannot . . . explain why counsel would choose this arguably more difficult defense [*i.e.*, P.L. § 35.15(2)] when he had available to him a defense designed for Mr. Williams' circumstances [*i.e.*, P.L. § 35.30(4)]: the application of deadly force against the fleeing perpetrator of a robbery who had used deadly force against petitioner."  Pet'r Mem. at 13 (Dkt. #38). According to Williams,  P.L. § 35.12(2) is a more "difficult" defense because it contains a "duty to retreat" element while P.L. § 35.30(4) does not contain such a requirement. *Compare* N.Y. Penal Law § 35.12(2) *with* N.Y. Penal Law § 35.30(4). Williams is correct that P.L. § 35.30(4) does not require the citizen to retreat if presented with an opportunity to do so.  The greater hurdle posed by both the "citizen's arrest" justification defense and the "regular self-defense" justification defense, and the one which this Court finds that Williams was unable to clear, given the facts of his case, was the requirement that petitioner "reasonably believe" that the use of deadly physical force was "necessary" under the circumstances presented. *Compare* N.Y. Penal Law § 35.12(2) *with* N.Y. Penal Law § 35.30(4).

Both P.L. § 35.12 and P.L. § 35.30(4) contain a "reasonableness" requirement. In this Court's opinion, the prosecution's evidence easily defeated either defense because it overwhelmingly proved, beyond a reasonable doubt, that Williams did not act reasonably during his encounter with Bryant. This is discussed fully below in this Court's analysis of the "prejudice" component of *Strickland* with respect to trial counsel's failure to pursue the P.L. § 35.30(4) defense.

-28-

In its research, the Court found only five reported decisions in New York that mentioned P.L. § 35.30(4), and none of them appeared to be on all fours with petitioner's case. The dearth of case law on P.L. § 35.30(4) indicates that is infrequently asserted and that it is a relatively untested defense–an additional reason why this Court believes that trial counsel acted reasonably in not pursuing the "citizen's arrest" justification defense under P.L. § 35.30(4).

In this Court's opinion, trial counsel's chosen defense strategy was a reasonable one based on the information available to him. First, trial counsel was bound by his client's sworn statement to the police. To the extent that petitioner's version of events supported a defense of justification at all, a general defense of justification under P.L. § 35.12 was comparatively more plausible than a "citizen's arrest" defense under P.L. § 35.30(4) for the reasons discussed above. In the statement, Williams related that he initially gave chase because he wanted his necklace back. Once Williams got his necklace back, however, the victim allegedly escalated the encounter by punching him, and "that's how the fight started," A.9. Williams then described a life-and-death struggle between him and the victim that ended in Williams administering CPR to the victim to no avail. A.9. Williams told the police that he left the stolen necklace, over which Williams now argues he was seeking to effect a citizen's arrest of Bryant, at the crime scene. Williams never reported a robbery, and did not remain at the scene to speak to the police. Moreover, no necklace was ever recovered and there apparently were no witnesses to corroborate Williams' story about the robbery of the necklace.

Trial counsel had to contend with the fact the prosecution had two eyewitnesses, Walker and her niece, Johnson, who claimed to have witnessed Williams administer not one but two brutal beatings to Bryant, and continue to beat him despite their entreaties to stop. According to

Walker, when she told Williams to stop beating the victim otherwise Williams was going to kill

him, Williams said that was what he intended to do.  In contrast to the extensive injuries

sustained by the victim, Williams told the police that he only sustained "scratches around [his]

neck" and "bruises on [his] ribs and arms," and apparently did not seek any medical attention

after the incident. A.10. Both eyewitnesses testified that they saw Williams strike the victim with

both fists multiple times, stomp on his chest, and kick him in the head. Williams had told the

police that he and the victim were the only participants in the incident and that he only had

punched the victim once. *See* A.9-10.

 After reviewing the record in this matter, there is no question that Williams' trial counsel

had a difficult case with which to work. Trial counsel's strategy was to attack the witnesses'

credibility and their ability to perceive accurately what they had seen on the night of the incident,

and to highlight inconsistencies in their testimony. For instance, trial counsel pointed out that

Johnson testified that it was "just getting dark" at 7:45 p.m. at the time she observed the incident,

which took place in the dead of winter in January in Buffalo, New York. Johnson also testified

that it was snowing lightly, but trial counsel argued to the jury that other witnesses testified as to

how bad the weather was and the police photographs showed that it was snowing hard. T.555.

Trial counsel also attacked Walker's ability to actually see what she said she observed, noting

that Walker had told the police that Bryant's assailant was in his late twenties, *see* T.221, but

Williams was only eighteen at the time of the incident. Walker also had described the assailant as

between 5'8" and 5'10", *see* T.85, but Williams actually was 6'0" tall. Trial counsel argued that

Walker was unable to accurately estimate the height and the weight of the prosecutor in court and

was "a woman who claimed she didn't know if her New York State driver's license required her

to wear glasses or not" and "claim[ed] she didn't know if she wore glasses to correct her vision

for reading or to correct it for distance." T.556.  Trial counsel urged the jury to find that Walker's

eyewitness testimony was not reliable since three days after the incident, Walker was unable to

pick Williams' photograph out of an array. Although Walker said that the assailant had a "rough

voice," she also stated that it was like pop-music singer Michael Jackson's. In closing, trial

counsel argued,

> You heard [Williams'] voice, you heard his testimony that while trying to retrieve
> his property, a violent struggle ensued, that he feared for his life. That Daryl
> Bryant had his hands around his neck, that he couldn't get away. That he fought
> back. You heard him testify on cross-examination that, yes, he was getting angry,
> maybe he overreacted, but that's not what the evidence suggests. The evidence
> suggests that he was defending himself, that he was using the force necessary to
> protect himself. He feared for his life and believed that if he didn't fight, that he
> would be killed. You heard him testify that he had been trained in CPR, that he
> administered CPR to Daryl Bryant there. He walked away believing that he had
> killed Daryl Bryant."

T.568-69.

  In *Trapnell v. United States*, 725 F.2d 149, 155 (2d Cir.1983), the Second Circuit stated,

"We have repeatedly noted our reluctance to second-guess matters of trial strategy simply

because the chosen strategy was not successful." *Id.* at 155 (citation omitted). Where, as here, a

defendant's trial counsel " presents a well-grounded, but ultimately unsuccessful defense," that

attorney "will not later be held to have provided ineffective assistance of counsel." *Gatto v.*

*Hoke*, 809 F. Supp. 1030, 1039 (E.D.N.Y. 1992) (citing *Trapnell*, 725 F.2d at 155); *United States*

*v. Vegas*, 27 F.3d 773, 778 (2d Cir. 1994) ("As is often the case when convicted defendants

complain after-the-fact of their lawyers' trial performance, we find that the choices made by the

attorney were matters of trial strategy; because counsel's strategy was a reasonable one, these

choices do not show incompetence. Much of the objected-to performance is explained by counsel's strategic decision to pursue the defense that Vegas was entrapped by Carrero, rather than contest Vegas's involvement, a decision that appears sound in light of the tape-recorded evidence of Vegas's participation.") (citing *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.) ("[D]ecisions which fall squarely within the ambit of trial strategy . . . if reasonably made, will not constitute a basis for an ineffective assistance claim[.]"), *cert. denied*, 484 U.S. 958 (1987)); *see also United States v. Aguirre*, 912 F.2d 555, 561 (2d Cir. 1990).

Judging counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct, as the Supreme Court instructs, *see Strickland*, 466 U.S. at 690, the Court cannot find that trial counsel's failure to pursue an alternative defense of justification under P.L. § 35.30(4) was professionally unreasonable. To the contrary, the Court finds that trial counsel's decision to pursue the general defense of justification or "self-defense" was reasonably made given all of the information he had available to him at the time.

**2.    Trial counsel's performance did not prejudice the defense.**

To demonstrate the requisite level of "prejudice" resulting from trial counsel's performance, it is not sufficient for a defendant attempting to obtain reversal of his conviction to merely show that counsel's errors had "some conceivable effect" on the outcome. *Strickland*, 466 U.S. at 693. Rather, there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* This determination, unlike the determination whether counsel's performance fell below an objective standard of reasonableness, may be made with the benefit of hindsight. *See Lockhart v. Fretwell*,

506 U.S. 364, 372 (1993) ("We adopted the rule of contemporary assessment of counsel's conduct because a more rigid requirement 'could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.' ") (quoting *Strickland*, 466 U.S. at 690)).

The Court has reviewed the trial transcript in its entirety and concludes that trial counsel's failure to pursue a defense of justification under either  P.L. § 35.30(4)(a) or (b), the "citizen's arrest" statute, did not prejudice petitioner's right to a fair trial. "Justification is a defense, not an affirmative defense, and therefore the People bear the burden of disproving it beyond a reasonable doubt[.]" *Matter of Y.K.*, 87 N.Y.2d 430, 433 (N.Y. 1996) (citing N.Y. Penal Law § 35.00). Section 35.00 of the Penal Law provides that  "[i]n any prosecution for an offense, justification, as defined in sections [N.Y. Penal Law §§] 35.05 through 35.30, is a defense." N.Y. Penal Law § 35.00; *accord, e.g.*, *Matter of Y.K.*, 87 N.Y.2d at 433; *People v. McManus*, 67 N.Y.2d 541, 547 (N.Y. 1986); *People v. Goetz*, 68 N.Y.2d 96, 116 (N.Y. 1986). As discussed below, given the overwhelming evidence presented by the prosecution that negated the critical element of "reasonableness" that is present in P.L. § 35.30(4)(a) and P.L. § 35.30(4)(b), there is no reasonable probability that the outcome would have been different had the jury been instructed on the elements of the "citizen's arrest" defense set forth in P.L. § 35.30(4)(a) and P.L. § 35.30(4)(b).

As noted above, this Court could find only a handful of decisions addressing P.L. § 35.30(4), but the New York Court of Appeals has written extensively on justification in the context of P.L. § 35.15(2), the regular "self-defense" statute. Both P.L. § 35.12(2) and P.L. § 35.30(4) contain language requiring the person exercising deadly physical force to "reasonably

believe" such force to be "necessary."[4]  New York's statutes codifying the right recognized at common law to use deadly physical force in self-defense "have never required that an actor's belief as to the intention of another person to inflict serious injury be correct in order for the use of deadly force to be justified, but they have uniformly required that the belief comport with an objective notion of *reasonableness*." *People v. Goetz*, 68 N.Y.2d at 107 (internal citation omitted) (emphasis supplied).  The Court of Appeals in *Goetz* explicitly declined to interpreting the general justification statute, P.L. § 35.15, to require only that the defendant's belief was "reasonable to him," as that "would hardly be different from requiring only a genuine belief; in either case, the defendant's own perceptions could completely exonerate him from any criminal liability." *Id.*[5]

---

[4]       Under P.L. § 35.30(4)(b), a defendant may use deadly physical force "to . . . [e]ffect the arrest of a person who has committed . . . robbery" or certain other enumerated felonies, "and who is in immediate flight therefrom[,]" N.Y. Penal Law § 35.30(4)(b).  In order for the use of deadly physical force to be justified under subsection (b), the defendant must "*reasonably believe*[] *such* [deadly physical force] *to be necessary*" to effect the arrest of the person who has just committed one of the enumerated felonies. N.Y. Penal Law § 35.30(4).  Section 35.30(4)(a) applies to situations involving offenses other than the felonies listed in subsection (b) and permits a defendant making an arrest to use deadly physical force provided that he "*reasonably believe*[ ] *such to be necessary* to . . . [d]efend himself . . . from what he . . . reasonably believes to be the use or imminent use of deadly physical force[,]" N.Y. Penal Law § 35.30(4)(a).  Thus, Section 35.30(4)(a) contains the additional requirement the person against whom the defendant exercised deadly physical force was himself also threatening to use or using deadly physical force. *See* N.Y. Penal Law § 35.30(4)(a).

Penal Law§ 35.15(1) provides that "[a] person may, subject to the provisions of [P.L. § 35.15(2)], use physical force upon another person when and to the extent he or she *reasonably believes such to be necessary* to defend himself, herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person[.]" N.Y. Penal Law § 35.15(1).  Penal Law § 35.15(2) in turn provides that "[a] person may not use deadly physical force upon another person under circumstances specified in [P.L. § 35.15(1)] unless . . . [t]he actor reasonably believes that such other person is using or about to use deadly physical force. Even in such case, however, the actor may not use deadly physical force if he or she knows that with complete personal safety, to oneself and others he or she may avoid the necessity of so doing by retreating[.]" N.Y. Penal Law § 35.15(2).

[5]       "We cannot lightly impute to the Legislature an intent to fundamentally alter the principles of justification to allow the perpetrator of a serious crime to go free simply because that person believed his actions were reasonable and necessary to prevent some perceived harm. To completely exonerate such an individual, no matter how aberrational or bizarre his thought patterns, would allow citizens to set their own standards for the permissible use of force. It would also allow a legally competent defendant suffering from delusions to kill or perform acts of violence with impunity, contrary to fundamental principles of justice and criminal law." *People v.*

-34-

Thus, the New York Court of Appeals held in *People v. Goetz* that the general

justification statute (P.L. § 35.15) imposes a two-part test which involves both subjective and

objective components:

> When a defendant claims the use of force was justified, the fact finder must first
> determine if defendant believed physical force (or deadly physical force) was
> necessary to defend against the imminent use of physical force (or deadly physical
> force). That is the subjective component. If the People fail to disprove defendant
> believed physical force was necessary, the fact finder must next consider whether
> defendant's belief was reasonable, that is, whether a reasonable person would have
> held that belief under the circumstances which existed. It is not enough that the
> defendant believed that the use of force was necessary under the circumstances;
> his reactions must be those of a reasonable person similarly confronted (*see also*,
> *People v. Collice*, 41 N.Y.2d 906, 394 N.Y.S.2d 615, 363 N.E.2d 340). That is the
> objective component.

*Matter of Y.K.*, 87 N.Y.2d at 434 (citing *People v. Goetz*, 98 N.Y.2d at 114-15 ("The jury must

first determine whether the defendant had the requisite beliefs under section 35.15, that is,

whether he believed deadly force was necessary to avert the imminent use of deadly force or the

commission of one of the felonies enumerated therein. If the People do not prove beyond a

reasonable doubt that he did not have such beliefs, then the jury must also consider

whether these beliefs were reasonable. The jury would have to determine, in light of all the

"circumstances", as explicated above, if a reasonable person could have had these beliefs.")).

It bears emphasizing that when courts in New York have evaluated this objective component of

the justification defense, a particular defendant's belief that the use of force was necessary under

the circumstances is not enough. *Id.* (citing *People v. Collice*, 41 N.Y.2d 906, 907 ("On no view

of the evidence has a justification defense been established. Even if defendant had actually

---

*Goetz*, 68 N.Y.2d at 111.

believed that he had been threatened with the imminent use of deadly physical force, and there is

no evidence that he had so believed, his reactions were not those of a reasonable man acting in

self-defense[.]")).  Rather, as the New York Court of Appeal has squarely held, the defendant's

"reactions must be those of a reasonable person similarly confronted." *Matter of Y.K.*, 87 N.Y.2d

at 434. The objective component's determination of reasonableness "must be based on the

'circumstances' facing a defendant or his "situation[,]" *People v. Goetz*, 68 N.Y.2d at 114

(quotations omitted).

Turning first to the subjective component of P.L. § 35.30(4)(a) and P.L. § 35.30(4)(b), the

Court will assume that there was sufficient proof to satisfy the requirement that Williams himself

believed that deadly force was necessary under the circumstances. The standard for reviewing

legal sufficiency of the evidence supporting jury verdicts of guilty is the same in both New York

and federal criminal proceedings: "[W]hether 'after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt[.]'" *People v. Contes*, 60 N.Y.2d 620, 621 (N.Y. 1983)

(quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)). In Williams'

case, even if the jury had been instructed on the "citizen's arrest" justification defense, the

evidence at trial, "view[ed] . . . in the light most favorable to the prosecution" was much more

than "legally sufficient to disprove the defense" under P.L. § 35.30(4) "beyond a reasonable

doubt." *People v. Vanegas*, 237 A.D.2d 469, 469 (App. Div. 2d Dept. 1997) (citing *People v.

Contes*,  60 N.Y.2d at 621).  Provided that the jury found the prosecution failed to disprove

beyond a reasonable doubt that Williams personally believed deadly physical force was

necessary, the jury next was required to consider whether his belief was objectively

reasonable–"that is, whether a reasonable person would have held that belief under the circumstances which existed." *People v. Goetz*, 68 N.Y.2d at 115.

Williams testified that he and the victim were choking each other simultaneously for "two to three minutes," struggling side by side in the street, and that no blows were exchanged during that time. Williams admitted that the victim did not have a weapon at any time during the altercation. The testimony of two disinterested eyewitnesses, Walker and Johnson, along with the medical evidence as to the injuries sustained by the victim, compellingly refuted Williams' story. Both eyewitnesses observed two separate beatings administered by Williams. In the first one, Williams beat the victim with his fists repeatedly and choked him, and then walked away, leaving the victim lying prone in the street. When Williams returned, the victim was still lying in the street, and Williams beat him again, this time jumping up and down on his chest and kicking him in the head. Although the eyewitnesses saw Williams choking the victim at some point, they never saw Williams being choked. Moreover, they never saw the victim strike Williams. Walker told Williams twice to stop beating Bryant because otherwise he was going to kill him; Williams responded that that was what he intended to do. Johnson corroborated this testimony.  Both witnesses observed Williams pumping his fists in the air afterwards, as if he were doing a "victory dance." During the altercation, Williams did not mention his allegedly stolen necklace but instead demanded the money that Bryant supposedly owed him for drugs. This testimony was corroborated by the discovery, after the incident, of cocaine in Bryant's blood and a crackpipe in his pocket. Moreover, the nature and severity of the injuries sustained by the victim was consistent with how the eyewitnesses described the fight and wholly inconsistent with Williams' version of events. The medical evidence showed that the victim suffered multiple traumas to his

head and face; he had several teeth knocked loose and had an abrasion on the side of his face that could have been inflicted by the toe of a boot or shoe. The medical examiner testified that the victim had been beaten in the head so many times that a pressure cone had formed in the cerebellum due to the swelling of the brain.  To a reasonable degree of medical certainty, the cause of death was multiple blunt force trauma to the head–not strangulation.  There was no way to reasonably reconcile the medical evidence with Williams' claim that he only punched the victim once and that the victim died after a struggle in which the two men strangled each other for "two to three minutes." On the evidence presented at Williams' trial, no rational jury could have reached the conclusion that petitioner's use of deadly physical force was "objectively reasonable" under the circumstances with which he was confronted.

The Supreme Court has instructed that in determining whether a defendant was prejudiced by counsel's performance it must ascertain whether there is a "reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695; *see also id.* at 696 ("Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors."). In making the prejudice determination, a reviewing court "must consider the totality of the evidence before . . . jury." *Id.*  The Court finds it telling that Williams does not address the strength of the prosecution's case in his discussion of "prejudice." Williams argues only that he "was unquestionably prejudiced by the failure of

counsel to pursue the more germane Penal Law § 35.30(4) defense" because "Williams'

testimony alone provided sufficient evidentiary grounds to find that Bryant had robbed him of the

gold necklace and then immediately fled," and "also established that the physical force he used

against Bryant was employed during the course of his apprehension of Bryant after the robbery,

and while Bryant was strangling him." Pet'r Mem. at 13-14 (Dkt. #38). By selectively

considering the evidence favorable to the defense, Williams has addressed only the issue of

whether Williams' testimony entitled him to a jury charge on justification under P.L. § 35.30(4).

Establishing entitlement to a jury instruction on a defense does not necessarily lead to the

conclusion that it ultimately would have succeeded. Because the case against Williams had

"overwhelming record support," *Strickland*, 466 U.S. at 696, there is no reasonable probability

the jury would have reached a different verdict had it considered whether Williams' actions were

justified under the "citizen's arrest" defense set forth in P.L. § 35.30(4).

      Based on the information available to him at the time–most importantly, his client's

sworn statement to the police–trial counsel was reasonable in pursuing a defense of justification

and not presenting an alternative defense under the "citizen's arrest" justification statute.  In this

Court's opinion, trial counsel in Williams' case "followed a course that, at the time, appeared to

be the safest and most effective one available 'after thorough investigation of law and facts

relevant to plausible options[.]'" *United States v. Aguirre,* 912 F.2d at 562 (quoting *Strickland*,

466 U.S. at 690).  The Court cannot find that trial counsel's disregard of the "citizen's arrest"

defense in P.L. § 35.30(4) fell below what was required by prevailing professional standards of

conduct. *See Strickland*, 466 U.S. at 688; *see also id.* at 690. Furthermore, trial counsel in

Williams' case was faced with a "strong [prosecution] case that was difficult to defend, a fact

that militates against . . . finding prejudice from any challenged defense tactic." *United States v. Aguirre*, 912 F.2d at 562 ("We also disagree with the district court's conclusion that the Orovic defense might have caused the jury to reach a different result. From start to finish the telltale evidence was the excessive weight of the Samsonite bag. In summation, the prosecutor argued in part, 'How can Mr. Aguirre carry that unusually heavy bag without knowing what was going on? How can someone so accustomed to carrying a similar bag not know?' During deliberations, each juror lifted the suitcase, apparently to determine its weight; moments later, the verdict was announced. Even if counsel encountered no roadblocks in execution of the Orovic theory, such as adverse admissibility rulings or unfavorable revelations from witnesses, the evidence would have failed to counter the jury's reasonable inference that a flight attendant of [defendant]'s experience would hardly have carried an excessively heavy bag without having some knowledge of its contents.").  Given the overwhelming evidence presented by the prosecution, there was no reasonable probability of a different outcome had trial counsel argued that Williams was justified in using deadly force against victim based on the "citizen's arrest" defense set forth in P.L. § 35.30(4).  *See Strickland*, 466 U.S. at 694 ( "A reasonable probability is a probability sufficient to undermine confidence in the outcome." ). The Court therefore concludes that Williams has not established either prong of the *Strickland* standard for demonstrating that trial counsel was ineffective as a consequence of his failure to pursue a justification defense under P.L. § 35.30(4). It necessarily follows that the Appellate Division's denial of this claim of ineffective assistance raised on direct appeal was not an unreasonable application of clearly established federal law. *Hemstreet v. Greiner*, 2007 WL 2002733, at *7.

**IV.      Conclusion**

For the foregoing reasons, the Court denies petitioner Jameel Williams' request for a writ of habeas corpus based upon his claim that trial counsel rendered ineffective assistance due to his failure to pursue the justification defense set forth in P.L. § 35.30(4).  Because the Court finds that Williams has failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: August 14, 2007
Rochester, New York.